Decided 31 March; modified 30 June, 1902.

## WILSON'S GUARDIANSHIP.

### CUTTING *v.* SCHERZINGER.

[68 Pac. 393, 69 Pac. 439.]

GUARDIAN'S ACCOUNTS—JURISDICTION OF PROBATE COURT.

1. A probate court has jurisdiction to settle the accounts of a guardian, upon the petition of a subsequently appointed guardian, whatever may be the rule upon the intervention of the sureties of the first guardian: *Herren's Estate,* 40 Or. 90, applied.

GUARDIAN'S ACCOUNTS—NECESSARY PARTIES.

2. In a proceeding to settle the accounts of a removed guardian without attempting to surcharge his accounts, but merely to determine whether additional credits should be allowed, the removed guardian is not a necessary party.

40 OR.—23.

GUARDIAN'S ACCOUNTS—JURISDICTION TO DETERMINE.

3. A proceeding to settle the accounts of a removed guardian, and to determine whether he should be allowed further credits, as claimed by his sureties, is within the jurisdiction of the county court, and a recourse to a court of general equity jurisdiction need not be had.

EXPENDITURES OF WARD'S FUNDS.

4. Though a guardian ought not to incur expenses for the support of his ward without a direction from the county court, yet if he does incur such expenses, and clearly shows the necessity therefor, he should be allowed credit for such expenditures in the settlement of his accounts, if they are such as the court would have originally authorized.

SUFFICIENCY OF EVIDENCE.

5. The evidence adduced does not seem to justify the conclusion of the probate court that the guardian did expend for the care and support of his wards the sum allowed his sureties as a credit, and the decree will be modified by reducing the credit to $462.

From Tillamook:  REUBEN P. BOISE, Judge.

This is an appeal from a decree affirming in part an order of the county court settling a guardian's account. Some time prior to 1891 one Brady Wilson died, leaving a widow and five minor children. During that year the widow married C. G. Cutting, and he thereafter resided with the family on her homestead in Tillamook County until November, 1897. On October 26, 1895, he was appointed guardian of his stepchildren, aged from eight to fifteen years, and in March, 1896, received as such guardian from the estate of their grandfather $1,746. On September 8, he filed an account showing the receipt of the money referred to, and an expenditure by him of $104. About a year later he filed another report, in which he stated that he should be charged with an additional sum of $83.97 received on account of his wards, and $47.55 interest, and was entitled to a credit of $152.05 for the expense of a trip to the State of Illinois on business connected with his guardianship and for attorney's fees while there. This latter account, being unsatisfactory to the court, was disallowed, and he was ordered to file an amended account by a certain date. On November 20, 1897, and before the time he was required to appear and file the amended account, Cutting left the state, and never afterwards appeared in court or filed any account of his transactions as guardian or statement of the condition

of the funds belonging to his wards, except that in September, 1898, he wrote a letter to the county clerk, in which he undertook to give a statement of his receipts and disbursements This letter was filed with the papers in the case, but no action was ever had thereon by the county court, nor was it ever treated or regarded in any sense as an account. No account or pretended account filed by the guardian was ever allowed or approved by the county court, except possibly the first one, filed in September, 1896. On May 2, 1899, upon the petition of his bondsmen and Mrs. Cutting, he was removed as guardian, and Mrs. Cutting, the mother of the children, subsequently appointed in his place. On July 6 of that year, Cutting's bondsmen filed a petition in the county court, alleging, in substance, that he had expended a portion of the funds belonging to his wards for their support, maintenance, and education, and asking that he be credited therewith in the settlement of his accounts. Citation was issued and served on the wards and their mother, with whom they resided. On October 18, 1899, Mrs. Cutting, who had been appointed guardian, petitioned the court for an order approving, as a final account of Cutting, the statement contained in the letter from him to the county clerk in September, 1898, and at the same time filed an answer to the petition of the bondsmen theretofore filed. Upon a trial of the issues thus made, the county court found that Cutting's account should be credited with the sum of $900.20 for money expended by him for the support, maintenance, and education of the wards, and $100 for services as guardian. From this order, one of the wards, who had in the meantime become of age, and the guardian of the others, appealed to the circuit court, where the decree of the county court was affirmed in all particulars, except the allowance for services as guardian. From this decree an appeal has been taken to this court.

MODIFIED.

For appellants there was a brief and an oral argument by *Mr. Robert C. Wright.*

For respondents there was a brief and an oral argument by *Mr. B. L. Eddy.*

MR. CHIEF JUSTICE BEAN, after stating the facts in the foregoing terms, delivered the opinion of the court.

1. At the outset it is contended that the sureties on the guardian's bond cannot invoke the jurisdiction of the county court to settle the accounts of their principal, or for the allowance of credits therein. Whatever the rule may be in the case suggested is immaterial here, because the county court acted, not only on the petition of Cutting's bondsmen, but that of the subsequently appointed guardian, and even if the bondsmen could not intervene to protect their own interests, as they would seem to have a right to do [Woerner, Guardianship, p. 341, § 101; *In re Spath's Estate,* 144 Pa. 383 (22 Atl. 749); 15 Ency. Pl. & Pr. (2 ed.) 90], there can be no question but what the jurisdiction of the court was properly invoked by the guardian then in office: *Herren's Estate,* 40 Or. 90 (66 Pac. 688).

2. The claim is also made that Cutting is a necessary party to this proceeding; but there is no attempt to surcharge or falsify his statements or alleged accounts, so far as the actual receipts and disbursements shown thereby are concerned, or to charge him with any liability not disclosed. The single question is whether he should be allowed additional credits, and all parties interested in that controversy are before the court.

3. Again, it is urged that this is, in effect, an attempt to surcharge and falsify the accounts of a guardian, and that recourse must be had to a court of general equity jurisdiction for that purpose. As we have already suggested, no account or pretended account of Cutting was ever approved by the county court, unless, perhaps, the one filed soon after his appointment, and which merely contained a statement of the

amount of money received by him and some small items of expenditures. Moreover, the account, as finally settled and approved, is made up from those previously filed by the guardian, except one item of $420.84, which he wrongfully claimed to have paid to one of his wards after she became of age, and another for money expended in the support and maintenance of his wards. Upon this record, we are clearly of the opinion that the county court had jurisdiction to make the order complained of.

4. The only question remaining, therefore, is whether, under the circumstances as disclosed by the testimony, the guardian should be credited with the amount so expended. It is the duty of a guardian to see that his ward is suitably maintained, and upon proper application therefor the county court may and will authorize the use of the principal of his ward's funds, as well as the income thereof, if necessary, for that purpose. The usual, and no doubt better, practice is to obtain an order authorizing the expenditure, and as a general rule a guardian cannot encroach upon the principal without such order; but it is believed this rule is not inflexible, so that if the income is not sufficient, and the ward's welfare requires it, the guardian may resort to the principal, and, if he has in fact used a part of it for the support and maintenance of his ward without authority of the court, it may and will, in a proper case, ratify such expenditures. If, however, he has taken this responsibility, he is required to make out as clear a case to obtain the order ratifying the expenditure as if he had applied for authority in advance. The true criterion in such case would seem to be whether the court would have antecedently authorized the expenditure: Woerner, Guardianship, p. 348, § 104; 15 Ency. Pl. & Pr. 100; *In re Beisel's Estate,* 110 Cal. 267 (40 Pac. 961).

It is vigorously contended, however, that because there is no evidence that Cutting intended to take credit for or charge his wards for their support and maintenance, no allowance can be made for that purpose. As a general rule, it may be conceded that when a stepfather voluntarily assumes the care and sup-

port of a stepchild he stands in the place of a parent, and is not entitled to reimbursement for its support and maintenance out of the separate estate of the child. There is no law, however, requiring him to do so; and, unless he voluntarily chooses to assume the duties of a parent, he is entitled to charge for its support and maintenance, and, if its guardian, to a credit in his accounts for any money expended for that purpose: *Gerber* v. *Bauerline,* 17 Or. 115 (19 Pac. 849). The vital question here is not whether a stepfather who supports and maintains his stepchildren from his own funds is entitled to reimbursement therefor from their estate, but whether he should be credited in the settlement of his accounts as their guardian with expenditures out of the money of his wards for such purpose. The claim of the petitioners and findings of the county court are to the effect that Cutting used a portion of the money belonging to his wards for their support and maintenance, and the only question is whether, if that be true, he should be allowed credit therefor. Originally, the power to appoint a guardian of the person and estate of a minor belonged to a court of chancery. In this country, however, as a general rule, such power has by the legislature been delegated or conferred upon particular courts, and in this state upon the county court: Hill's Ann. Laws, § 895. In .the execution of the power, however, the county courts are governed in a large measure by the rules formerly applicable to similar proceedings in the courts of chancery, and the settlement of the accounts of a guardian in the county court is substantially the same as the settlement of the accounts of a trustee appointed . by the general court of equity, and is to be determined on general equity principles. There are no hard and fast rules by which the court is bound. While it cannot be too strict and vigilant in investigating the accounts of a guardian where there are indications of bad faith or fraud, yet, in the absence of all indications of that kind, a guardian should not, in the settlement of his accounts, be held to the strict rules of evidence. As a general rule, full items with vouchers for all expenditures should be required, and credits ought not to be al-

lowed without them; but this is not indispensable, and in a clear case, where there is no doubt of the expenditures having been made nor of the guardian's good faith, vouchers may be dispensed with.   Each case must necessarily depend upon its own particular facts, and on the equities thereof.

5. Now, it seems to us plain from the record of this cause that Cutting used a portion of his ward's money for their support, maintenance, and education, and there is much in the record to indicate that he intended his sureties should not have the benefit of a credit therefor.   From the time of his marriage with the mother of his wards, he and the family lived on an unproductive "rough mountainous ranch," and, according to the testimony of his neighbors, they were, up to the time he received the money belonging to his wards, in straitened circumstances, if not absolute poverty.   Mr. Goeres, a neighbor and wholly disinterested witness, testifies that up to that time the children were barefooted and ragged, and needed better food than they had; that Cutting's neighbors assisted him in work, as well as in food; that after his appointment as guardian he did but little work, but the children were better fed and clothed, and appeared in good circumstances.   Mr. Rock, another witness, says that prior to his appointment Cutting had no cows and no money with which to buy food;   that he made no secret of the fact that he was in poor circumstances; that for a time the children did not go to school for want of sufficient clothing to wear; that after his appointment and receipt of his wards' funds the children went to school, and had plenty of everything, although there was no discernible increase in Cutting's earnings.   Mr. Walker, another neighbor, testified to substantially the same state of facts. The testimony of the bondsmen, who were Cutting's neighbors, and who went on his bond for the purpose of enabling him to obtain possession of the money belonging to his wards, "so that he could maintain them out of it," is all to the same effect.   One of them says that prior to Cutting's possession of his wards' money the family was in very poor circumstances; had very poor food and clothing, and most of the food they had the last

winter before the money came was donated to them; that the place on which they lived was very rough, mountainous, and covered with brush and logs, except a very small portion thereof; that only two or three acres were tillable, and upon these he raised a little hay and vegetables, and that he had no stock or other means of income. There was a noticeable difference after he received the money belonging to his wards. The children went to school, and were well and comfortably dressed and fed.

Another says: "I was intimately acquainted with Mr. Cutting since he was first married to the present Mrs. Cutting, and ever since then my family and his family visited back and forth considerable. I had some considerable business with Mr. Cutting in a small way; that is to say, Mr. Cutting worked for me on several occasions, and from talk that we had I became well acquainted with his financial circumstances at the time. I furnished him with work for potatoes to support that family. I also gave him salt salmon,—as many as he wanted,—and made no account of the same, and I know that they lived without meat for months, and without tea or coffee for months, and that their principal food was salt salmon and potatoes. While Mr. Cutting was working for me, he told me it was a very hard matter for him to support those children, but that they had an estate coming to them from their father, and if this estate could be put in shape so that he could maintain them out of it that he could get along all right, and he asked me to go on his bond if he was appointed guardian for those children. In the first place, I did not like to go on his bond, but I afterwards consented, and went on his bond. After Mr. Cutting was appointed as guardian, some six months after he received the money, which he told me amounted to 1,700 and some odd dollars, the condition of his family before he was appointed was such that they had not proper clothing or proper food. The children were all barefooted and in a ragged condition generally, and after Mr. Cutting got this money there was a great change in the way those children were clothed and fed. I was at the house many times, both previous

and afterwards, that Cutting was appointed as guardian. * * * Cutting told me himself on several occasions that he did not know how in the world he would support that family. I do know that Cutting had no credit at the stores in our neighborhood, and I seen him have to give security before he could buy two sacks of flour and a pound of tea. I also know the family lived well and were clothed well after Cutting was appointed as guardian of them." The witness further testifies that Cutting did not work any after his receipt of his wards' money, and had no income except what he derived therefrom. If needful, other quotations could be made from the testimony, showing the same state of facts, and pointing irresistibly to the conclusion that after Cutting's possession of such funds he used a portion thereof for their support and maintenance. The exact amount so used is difficult, if not impossible, to determine from the record. No account thereof seems to have been kept by Cutting, or, if so, it was not accessible to his bondsmen. The county court found from the entire evidence that the expenditure amounted to at least $7 a month for each child, and this finding was concurred in by the circuit court, and we are of the opinion that it is supported by the testimony. While it is difficult, if not impossible, from this record, to arrive at an accurate conclusion in the matter, it would be manifestly inequitable and unjust on that account to compel the bondsmen to make up the deficiency as shown by his alleged statement, without crediting him with the expenditures for the support and maintenance of his wards, when the evidence so clearly shows that he must necessarily have spent a considerable portion of their estate for that purpose.

Upon the whole, we are of the opinion that the conclusion of the county and circuit courts on the question is as nearly equitable and just as is possible under the circumstances. The decree from which this appeal is taken will therefore be affirmed.

Decided 30 June, 1902.

ON PETITION FOR REHEARING.

MR. CHIEF JUSTICE BEAN delivered the opinion.

The county and circuit courts allowed credit in the settlement of Cutting's account for money expended by him in the support, maintenance, and education of his wards, from March 11, 1896, to March 17, 1899, and, as no special question was made by appellant as to the time during which the allowance should have been granted, the court did not examine the record upon that point, naturally assuming that the amount only was in question. The petition for rehearing, however, calls attention to the obvious fact that sixteen months of the time covered by the findings of the county and circuit courts was after Cutting absconded and left the state, during which period it is manifest he did not contribute anything to the support of his wards. The findings and decree ought, therefore, to be modified to that extent. Mrs. Cutting testified that all the children lived at home from the time Cutting received the appointment as guardian, until he left the state, with the exception of Katie, who was home six months only. Cutting's account, therefore, should be credited for money expended by him for the support, maintenance, and education of Katie for six months, and twenty months each for the other three children, at $7 a month, making a total credit of $462, instead of $900.20, as allowed by the county and circuit courts. The former opinion will be modified in this regard, but in all other respects it will be adhered to.

The court did not undertake to state the record in detail, but only the substance thereof. Whatever may be said of the sufficiency of the allegations in the petition of the bondsmen, and the regularity of the proceedings in the county court, there was certainly enough before that court, in the petitions, answers, and replies, to warrant it in exercising its undoubted jurisdiction to settle the accounts of Cutting as guardian.

REHEARING DENIED; MODIFIED.