Argued May 29; affirmed July 2, 1935

# MOULTON *v.* HUCKLEBERRY ET AL.

(46 P. (2d) 589)

*Eugene K. Oppenheimer,* of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, and George P. Winslow, of Tillamook, on the brief), for appellants.

*Walter L. Tooze,* of Portland, for respondent.

BEAN, J.   The case is stated about as follows: Both defendants were duly licensed and practicing physicians and surgeons under the laws of the state of Oregon.   Dr. Shininger maintained an office at Wheeler, Oregon; Dr. Huckleberry maintained offices and had a competent nurse capable of taking care of emergency work at Garibaldi, about five miles distant from Rockaway, where plaintiff lived at the time of the first treatment.   Dr. Huckleberry's offices contained two hospital beds where emergency cases were treated and hospitalization given.   He was under contract with the Hammond Lumber Company at Garibaldi to furnish medical and surgical treatment to its

employees, numbering about 300, and had considerable private practice. Prior to August 25, 1933, plaintiff and her husband arranged to move to the city of Tillamook, and on that day the plaintiff was engaged in packing some things for the purpose of moving. The stairway leading from the upper floor of the small dwelling occupied by them was dark and narrow and had a turn in it near the bottom with a landing where there were some empty fruit jars and bottles. The plaintiff was walking down the stairs with an armload of fruit jars. When she arrived about two steps from the landing she fell forward from there to the landing. Her left knee struck and broke some of the glassware on the landing, and her left leg was doubled under. She could not move; she was carried or dragged down the remainder of the stairway to a chair in the kitchen. On examination of her left leg it was found that it was cut just below the kneecap. The gash was approximately four inches long, cut approximately straight across, and quite deep. It gaped open possibly an inch and was very bloody. As a result of this fall, with ensuing lacerations, the lower end of the patella on plaintiff's left leg was chipped off and the patellar tendon entirely severed. Plaintiff's husband was called and he, with aid, placed plaintiff in a car and they hurried to Garibaldi to see Dr. Huckleberry who had been their family physician. When they arrived at Garibaldi they found Dr. Huckleberry was absent, but found Dr. Shininger in charge of Dr. Huckleberry's offices, caring for Dr. Huckleberry's business. The nurse told Mr. Moulton "that Dr. Huckleberry had gone but Dr. Shininger was there". He was using Dr. Huckleberry's equipment and was also assisted by his nurse. Plaintiff was carried to Dr. Huckleberry's offices. Dr. Shininger proceeded to treat plaintiff, using Dr. Huckleberry's equipment and his regular

nurse. He washed out the wound and probed for glass. Dr. Shininger wholly failed and neglected to take X-rays or put the plaintiff through the most simple tests for the purpose of determining whether the patella tendon had been severed, and sewed up the surface wound without in any manner repairing, or attempting to repair, the severed tendon. At the time plaintiff could not bend or extend her leg without assistance, by the use of the other leg, or without some one aiding her, and this condition continued without any change until Dr. McClure operated upon her, about five months afterwards. Dr. Shininger visited plaintiff two or three times shortly after the accident and looked over the wound, but at no time required her to go through the most simple exercises for the purpose of determining whether the patella tendon had been severed. About 10 days following the accident, and on September 3, at the request of Dr. Shininger, plaintiff was brought to the office of Dr. Huckleberry in Garibaldi for the purpose of having the stitches removed. At that time plaintiff was on crutches. The wound had healed sufficiently to warrant the removal of the stitches, and they were removed, but plaintiff informed Dr. Shininger that she had no use of the leg, whereupon he told her it was ''all in her head'', that she could, and should use it, and that it would be all right. Plaintiff did not know what was wrong and relied upon the information given her by Dr. Shininger.

The most simple test would have shown the true condition at this time, but Dr. Shininger failed to apply such test. All of the doctors testifying upon the trial in this case, including the two defendants, stated that if the tendon was severed the most simple test would have disclosed it, and that the test should have been applied, regardless of what doctor was treating the

case, the same degree of care in this respect being required of all doctors, regardless of locality. The test is stated to be to require the patient to extend and hold the injured leg horizontally, sitting on a table or chair, and if she could raise the leg to an angle of 90 degrees, and hold it without assistance, it would plainly show that the tendon was not severed from the patella; on the other hand, if she could not so straighten out the leg, and hold it, it would indicate that the tendon or ligament of the patella was severed. It is likewise admitted by the doctors, including defendants, that if any physician failed to apply these tests it would be negligence on his part, that the exercise of the slightest diligence on the part of physicians, regardless of vicinity or locality, would have disclosed the nature and extent of the injury.

Regarding the arrangements made between Dr. Huckleberry and Dr. Shininger, before Dr. Huckleberry left for Chicago on his vacation, Dr. Huckleberry testified as follows:

"I arranged he (Dr. Shininger) should spend a part of his day in my office and take care of the work that came in there, because there was nobody else to take care of local work. * * *

"I don't think there was any definite understanding; he was to divide his time between his own office and my own. * * *

"He (Dr. Shininger) was to take care of the work, the mill patients for me, and divide the work at his own discretion. * * *"

For this work Dr. Shininger was paid $5 per day. Defendant Dr. Shininger testified that the understanding existing between them was as follows:

"A. Dr. Huckleberry told me he was going on a vacation, and that he would like to have someone take care of his patients, and so I agreed that I would spend

a part of each day in his office caring for patients that might come in there.

"Q. And was there any arrangement as to compensation?

"A. Yes, we talked it over and I told him that I would rather have a regular stipend than to collect money from each patient, because I felt that there would be less chance for disagreement that way, and if there was a regular stipend, everybody would be satisfied.

"Q. Did you agree on a definite stipend?

"A. Yes, we did, we agreed at five dollars a day."

After the stitches were removed plaintiff continued to walk about on crutches. There was no improvement in her condition. She could not extend her left leg without assistance. She suffered much pain in her left knee and never was able to go without crutches or other assistance, nor extend her left leg without assistance, until long after Dr. McClure had operated, as the testimony indicated.

Prior to August 25, 1933, plaintiff was in good health, was able to perform her household duties and had free, full use of her left leg, but on two occasions prior to that time, the last being some six or seven years prior, the plaintiff had suffered some cartilage trouble in her left knee, which she described by saying that the knee "just gives way on me, swells up". She stated that at that time she was laid up about two or three weeks, and was treated for this condition by Dr. Babb of Tillamook, a chiropractor; that she had once suffered the same trouble prior to that time when she was a girl about 15 or 16, and that about October 13, 1933, while plaintiff, with the assistance of two of her lady friends, was returning to her home from a show in Tillamook, she suffered a recurrence of the old cartilage trouble in her left leg. Dr. McClure, who afterwards operated on her knee, testified quite positively that the cartilage

trouble had nothing whatever to do, directly or indirectly, with plaintiff's severed tendon. After plaintiff's trouble with her knee October 13, Dr. Charlton of Tillamook was immediately called and advised hot packs to reduce the swelling. The swelling was so great that no examination could be made. Dr. Charlton advised that upon the reduction of the swelling plaintiff should have X-rays taken. He had no reason to suspect anything wrong with the knee, other than the cartilage trouble. There was nothing in the history of the case, as given to him, to make him suspect that the defendants had failed to properly treat plaintiff's knee. About November 7, 1933, the swelling being sufficiently reduced, Dr. Charlton took X-rays of plaintiff's knee, and they showed what appeared to be some bony fragments below the patella. The X-rays did not show a severed tendon. What appeared to be bony fragments, Dr. Charlton suggested might be ''joint mice'' and advised plaintiff to consult an orthopedic surgeon in Portland, suggesting three specialists, including Dr. McClure. In January, 1934, plaintiff called upon Dr. McClure. Putting her through the simple test of having her try to extend her left leg without assistance, Dr. McClure immediately and correctly diagnosed her true condition as a severed patellar tendon. About February 7 Dr. McClure operated upon her knee and opened the area around the knee, and he found the patellar tendon completely severed, the severance occurring immediately at the lower end of the patella or kneecap and directly under the place on the knee or leg where the original cut had occurred, as shown by the remaining scars. He also found the ends of the patella chipped off, accounting for the bony fragments shown in Dr. Charlton's X-ray. By performing a very difficult operation in a very skillful manner, Dr. McClure repaired

the damage to the severed patellar tendon. Plaintiff was in a cast for 60 days, and in bed, and at the time of the trial was still on crutches, though showing considerable improvement.

Dr. Shininger, who was in the employ of Dr. Huckleberry at the agreed wage of $5 per day, made no charges to patients for services performed in Dr. Huckleberry's offices, nor to any of the patients of Dr. Huckleberry. Dr. Huckleberry made these charges for Dr. Shininger's services and collected the same for his own use and benefit. Dr. Huckleberry rendered the bill to plaintiff for the services performed by Dr. Shininger for Dr. Huckleberry in his absence.

Defendants assign as error the finding by the court that defendants were guilty of malpractice. This presents the same question as would be raised by a motion for directed verdict upon a trial by jury. It is first submitted by defendants that "even if Dr. Shininger made a mistake in diagnosis he is not guilty of malpractice for the reason that a physician or surgeon is not responsible for a mistake in diagnosis *if he uses the proper degree of skill and care*" [Italics ours] : Citing 48 C. J. 1126, note 63; *Langford v. Jones,* 18 Or. 307 (22 P. 1064) ; *Schumacher v. Murray Hospital,* 58 Mont. 447 (193 P. 397, 403) ; *Lippold v. Kidd,* 126 Or. 160, 174 (269 P. 210, 59 A. L. R. 875) ; *Rising v. Veatch,* 117 Cal. App. 404 (3 P. (2d) 1023, 1025) ; *Beni v. Abrons,* 130 Cal. App. 206 (19 P. (2d) 523).

■■ It is the contention of plaintiff in this case that Dr. Shininger did not use the proper degree of skill and care in the diagnosis. Usually a patient is entitled to an ordinarily careful and thorough examination, such as the circumstances, the condition of the patient, and the physician's opportunities for examination will permit. Although he does not insure the correctness of his

diagnosis, a physician or surgeon is required to use reasonable skill and care in determining, through diagnosis, the condition of the patient and the nature of his ailment, and is liable for a failure, due to want of the requisite skill or care, to diagnose correctly the nature of the ailment, where injury or detriment results to the patient: 48 C. J. 1125, § 113.

■ It is also submitted that an unsuccessful or bad result is no evidence of negligence and a presumption of negligence does not arise from failure of success, citing *Hills v. Shaw,* 69 Or. 460 (137 P. 229) ; *Ewing v. Goode,* 78 Fed. 442; *Emerson v. Lumbermen's Hospital Ass'n,* 100 Or. 472 (198 P. 231). This may be conceded. The testimony tended to show, and the trial court found, that Dr. Shininger did not use the proper degree of care and skill in the diagnosis of plaintiff's knee, and that he failed to use the proper and well-known tests to ascertain whether the tendon was severed from the patella by requiring her to extend her leg horizontally, although the doctor claims that he did make the test. As the trial court found, the evidence showed such test was lacking. Dr. Shininger testified: ''I asked her to extend her knee, but as I said before, her cooperation was poor, but after a while she did extend her knee, but not fully.''

It has sometimes been broadly held that a physician or surgeon is not liable for an honest error or mistake in judgment. Nevertheless a limitation of this broad rule is recognized in cases that exempt from liability for errors of judgment only where there is a reasonable doubt as to the nature of the physical condition involved or as to the proper course to be followed, or where good judgments may differ. Also another limitation of the broad rule stated is found in cases that hold that a qualified physician is not liable for an error of judgment if

he applies ordinary and reasonable skill and care: 48 C. J. 1127, § 114.

■ Counsel for defendants argue that plaintiff's injury may have been caused at the time she had a recurrence of her old cartilage trouble October 13, 1933. Dr. McClure testified there was no direct connection between her knee injury of August 25 and the cartilage trouble on October 13, 1933, or any time. While the circumstances might leave room for some argument if the doctor's testimony conflicts with other circumstances, we would not be warranted in changing the findings of the court in this respect. The evidence tended to show that the treatment of plaintiff by Dr. Shininger was improper and negligent and the trial court so found. We are not authorized to change such finding on account of the slight conflict in the testimony.

Defendant's second assignment of error embraces the proposition that, irrespective of any negligence or malpractice on the part of defendant Dr. Shininger, the defendant Dr. Huckleberry is not responsible for the negligence or malpractice of Dr. Shininger for the reason that no agency existed between the two defendants, and that Dr. Shininger's treatment of plaintiff was performed upon Dr. Shininger's own responsibility and as an independent contractor and that the court erred in refusing to grant a motion of Dr. Huckleberry for a judgment of nonsuit at the conclusion of plaintiff's testimony and in refusing to sustain the objections made by defendant, Dr. Huckleberry, to plaintiff's proposed findings of fact in respect thereto.

The testimony tended to clearly show that when Dr. Huckleberry was about to leave for Chicago he employed Dr. Shininger to do his work for him for a regular compensation of $5 per day, and that Dr. Shininger

was the agent of Dr. Huckleberry and performed the work for Dr. Huckleberry's benefit. It is urged that he was not directed by Dr. Huckleberry, but it is plain that Dr. Huckleberry, at all times, had the right to direct and control the actions of Dr. Shininger or to terminate his employment. He could not direct details or just how the work was to be performed because he was absent. The case is different where one is employed to build a house according to plans and specifications.

After referring to the fact that Dr. Shininger was to use Dr. Huckleberry's office, his instruments and office equipment, and have the services of his nurse; that the work to be done by him included caring for the employees of the lumber company at Garibaldi, under the provisions of a contract between the company and Dr. Huckleberry; that Dr. Shininger was paid $5 per day by Dr. Huckleberry, and that bills to patients treated by him were sent out in Dr. Huckleberry's name, the learned trial judge held:

"Under these circumstances, the court is of the opinion that Dr. Shininger was an employee of Dr. Huckleberry, and the rule of respondeat superior applies. * * * It is uniformly held that where physicians are in a partnership, one partner is liable for the malpractice of another. That is on the principle of agency, and I see no reason why the same rule should not obtain when one physician hires another at a fixed stipend, to do his work for him. The argument that the employed physician must be held to be an independent contractor because his employer could not direct the means and methods by which the former should perform an operation, seems to me to prove too much. The same argument might be used with reference to the employer of a truck driver who sends him out to deliver a load of goods. The employer is in no position to direct the driving of the truck when an accident impends, but the relation of master and servant, and principal and agent, is not for that reason impaired."

■ It is true the physician who recommends or sends another physician is not liable for injuries resulting from the latter's want of skill or care unless the recommended physician is in his employment, or is definitely his agent or partner or unless due care is not exercised in making the recommendation or substitution: 48 C. J. 1136, § 142. It plainly follows that where one physician is in the employment and is definitely the agent of another physician, then the employing physician is liable for the negligent treatment or malpractice of his employee. As stated in 48 C. J. 1137, § 143: "A physician is responsible for an injury done to a patient through the want of proper skill and care in his assistant, apprentice, agent, or employee." See, also, *Ragin v. Zimmerman,* 206 Cal. 723 (276 P. 107); *Mullins v. DuVall,* 25 Ga. App. 690 (104 S. E. 513); *Comeaux v. Miles,* 9 La. App. 66 (118 So. 786); *McDonald v. Dr. McKnight, Inc.,* 248 Mass. 43 (142 N. E. 825); *Klitch v. Betts,* 89 N. J. L. 348 (98 Atl. 427); *Smith v. Swinehart,* 209 Ill. App. 175.

■ Dr. Shininger, instead of being an independent contractor, was the general agent and employee of Dr. Huckleberry, rendering Dr. Huckleberry liable for his malpractice, committed within the real or apparent scope of his authority, under the doctrine of respondeat superior, just the same as one partner is liable for the malpractice of his copartner. Such liability is based on the theory of agency. See *Wemmett v. Mount,* 134 Or. 305 (292 P. 93); *Gill v. Selling,* 125 Or. 587 (267 P. 812, 58 A. L. R. 1556). We find no fault with the law as expounded by able counsel for defendants, but we think it does not all apply.

"A general agent is defined to be one who is employed to transact generally all the business of the principal in regard to which he is employed, or in other

words to do all acts connected with a particular trade, business, or employment, or to transact all the business of his principal of a particular kind or in a particular place, and hence a general agency exists when there is a delegation of authority to do all acts connected with a particular trade, business, or employment, * * *." 2 C. J. 427, § 15. See, also, *Pacific Bis. Co. v. Dugger,* 40 Or. 362 (67 P. 32).

It is stated in 21 R. C. L. 393, § 38, as follows:

"Although the professions of medicine and surgery are such as contemplate that their followers shall perform few acts vicariously, and although this theoretical contemplation is in practice a fact, yet there are a few instances where a physician or surgeon is held liable for damages caused by no fault at all of his own, but entirely by the fault of another. Obviously, on the simplest principle of agency, a physician or surgeon may be liable for the damage caused by the neglect or default of his employee, or his servant, or, as it may be, of his assistant who is working under his directions, * * *."

We are aware of no provision of law which prevents a physician, like any one else, from creating between himself and another physician the relation of principal and agent, or master and servant, or employer and employee with all the incidents of such relationship, including liability for the acts of the agent, servant or employee performed within the real or apparent scope of his authority. Dr. Huckleberry had offices and a kind of miniature hospital at Garibaldi, a place of about 1,000 inhabitants, and we think he was responsible for the conduct of the physician or nurse employed by him.

To ascertain the truth, we must look further and see if the person who is said to be a servant is acting at the time for and in the place of his master, in accordance with and representing his master's will, and not his own: 1 Sherman & Redfield on Negligence, 388

§ 160; *Corbin v. American Mills,* 27 Conn. 274 (71 Am. Dec. 63).

■ Dr. Huckleberry employed and authorized Dr. Shininger to attend his offices, or so-called hospital, and treat the patients for him and in his stead, for Dr. Huckleberry's own benefit. Afterwards he ratified the treatment given by Dr. Shininger to the plaintiff by accepting the benefits of such treatment and presenting for collection a bill for such services. See *McLeod v. Despain,* 49 Or. 536 (90 P. 492, 92 P. 1088, 19 L. R. A. (N. S.) 276, 124 Am. St. Rep. 1066).

Where the evidence shows that the work done by one person, whose position is in question, was done for the benefit of another person and was performed under the conditions which are normally incident to service, it is sufficient to establish the existence of the relation of employer and employee, or master and servant: 1 Labatt's Master & Servant, 69, § 22. The mode of payment is not a decisive factor in determining the question of agency, but when considered with other factors it becomes very important for the purpose of determining whether one is a servant and not an independent contractor: 14 R. C. L. 75, § 11. We read in 14 R. C. L. 73, § 10, as follows:

"In determining the independence of the contractor, whether he or the master furnishes the workmen and appliances is a matter worthy of consideration, since, as a general rule, independent contractors furnish the means for the doing of the work; and mere servants generally use the means afforded by the master."

We find the following language on page 78 of the same volume:

"In the action against an employer for injuries, a presumption arises that a person working on the defendant's premises and performing work for the benefit of the defendant was a mere servant, and if the de-

fendant seeks to avoid liability on the ground that such person was an independent contractor, the burden is upon him to show the independence of the employee.''

Taking into consideration all of the circumstances to which we have referred tending to show the relation of master and servant, that is, the mode of payment, use of the master's premises, materials, equipment, appliances and nurse, the contract made between the parties, the master's right to terminate the employment at any time, Dr. Huckleberry's right to direct how the work should be performed, if he had been present or had the opportunity, the fact that the servant or employee was not employed to do a specific piece of work but was employed generally to do all the work of the master, and the other circumstances existing, they constitute sufficient evidence that Dr. Shininger was the employee of Dr. Huckleberry, and that Dr. Huckleberry was responsible for the conduct and improper treatment of plaintiff.

There was no error in denying the motion for a nonsuit or in holding that Dr. Huckleberry was liable for the improper treatment.

In *Landon v. Humphrey,* 9 Conn. 209 (23 Am. Dec. 333), it appears that four doctors entered into a written agreement in the town of Salisbury to vaccinate all persons in the town for an agreed price. In pursuance to the agreement the town was divided into four districts and the defendant, under his contract, was charged with the duty of vaccinating all persons in his district. He employed one Dr. Sprague to perform this duty for him. For Sprague's malpractice Dr. Humphrey was sued and was held liable.

We have carefully read all of the testimony and briefs. The case largely involves questions of fact.

We concur in the findings, both of fact and law, made by the trial court.

It was unfortunate for Dr. Huckleberry to be defendant in an action for malpractice when he took no part in the treatment of plaintiff, except by contract. We sympathize with him. Dr. Shininger will soon outgrow the matter.

It follows that the judgment of the circuit court must be affirmed. It is so ordered.