ROBERT GARONE et al., Appellants, v. ROBERTS' TECHNICAL AND TRADE SCHOOL, INC., Respondent-Appellant, and LEONARD BUDER et al., as Coexecutors of ALEXANDER DUBINSKY, Deceased, et al., Respondents.

First Department, April 3, 1975

*Morris Zweibel* of counsel *(Leon Segan* with him on the brief; *Segan, Culhane, Nemerov & Geen, P. C.,* attorneys), for appellants.

*William F. McNulty* of counsel *(Anthony J. McNulty* with him on the brief; *Daniel J. Coughlin,* attorney), for Roberts' Technical and Trade School, Inc., respondent-appellant.

*Alexander M. Selkirk, Jr.,* of counsel *(Furey & Mooney,* attorneys), for Presbyterian Hospital, respondent.

*James Borden Rosenblum* of counsel *(Martin, Clearwater & Bell,* attorneys), for George R. Merriam, Jr., respondent.

*Norman Bard* of counsel *(McAloon, Friedman, Schiavetti, Malang & Carroll,* attorneys), for Leonard Buder and another, respondents.

CAPOZZOLI, J. An examination of this record convinces us that the action against the defendant, Dr. George R. Merriam, Jr., should not have been dismissed by the trial court at the close of the entire case. A factual issue was presented as to whether this defendant was responsible in damages for his failure to obtain an informed consent for the operation.

"It is axiomatic that where there is a conflict in the evidence as to the issues controverted, matters of credibility and weight are for the jury to determine". *(Kelly v Watson Elevator Co.,* 309 NY 49, 51.) The dismissal by the court was error.

The plaintiff, Robert, who was 17 years of age when he became a patient of the defendant, Dr. Merriam, testified that, prior to the surgery, he was able to see through the left eye, stating specifically: "I seemed to have like blurred vision and a hair-type thing was floating in front of my eye" but he could see. That, when the bandages were removed at Dr. Merriam's office two or three weeks after the operation, he could not see at all through the left eye. He told Dr. Merriam about this and the latter informed him that it would take a while for his sight to come back. However, he never had sight in this eye again and the eye was removed in a subsequent operation by a different doctor. Everyone agrees that the subsequent removal of the eye was necessary and proper.

Robert testified that, before the operation, Dr. Merriam told him that he would first attempt to take the foreign body out with a magnet and, if that did not work, he would use tweezers. Nothing was said to him at any time as to any dangers being involved in the procedure.

The plaintiff's mother, Anna Garone, testified that Dr. Merriam told her that the plaintiff needed an operation for the removal of the foreign body. He also stated that he had performed this operation many times and that the plaintiff would be a new boy after it. He said nothing to her as to any danger in the operation or that he could lose the sight of the eye as a risk of same.

Plaintiff's father, Joseph Garone, testified that he was never told by Dr. Merriam, nor anyone else, that there was any danger in the surgery to be performed. Nor was he told there was a possibility that Robert would go blind or lose his eye. Dr. Merriam said that Robert would be a new man after the operation.

"Although the liability of a physician for injuries suffered by his patient is ordinarily based on the failure of the physician to exercise the required skill and care under the prevailing circumstances and in the particular situation, a physician may be held answerable * * * where he fails to inform the patient of the risks of a particular treatment so that the latter can decide whether he is willing to undergo the treatment.

"It is not enough for a physician merely to obtain consent before proceeding with treatment. He must obtain informed consent—that is, he is under an affirmative duty to make a reasonable disclosure to his patient of the known dangers which are incident to or possible in the proposed treatment; if he fails in that duty, he can be liable for malpractice even where the treatment is properly performed, if it injures the patient." (45 NY Jur, Physicians and Surgeons, § 161, p 423.) Also see: *Scott v Kaye* (24 AD2d 890) which held that an operation performed without an informed consent is an unauthorized operation and, further, fact issues as to whether a defendant performed an unauthorized operation, in that he failed to previously inform the plaintiff about the nature thereof and of the risks attendant thereon, were for the jury's determination.

In the case of *Fiorentino v Wenger* (19 NY2d 407, 415) in sustaining a verdict for the plaintiff against a doctor, and not against a hospital which was a codefendant, the court said:

"The surgeon's responsibility stemmed from his failure to obtain an informed consent from the boy's parents". The court quoted (p 416), with approval, language of a case decided in the State of California *(Salgo v Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal App 2d 560) and said: "In the *Salgo* case * * * the court noted that '[T]he physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote * * *. The other is to recognize that each patient presents a separate problem * * * and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent.'" and then went on to state that, on the evidence in the case before it, the jury was entitled to find that the surgeon had never explained sufficiently to the mother the hazards of the operation.

In *Darrah v Kite* (32 AD2d 208, 210–211) in discussing the case of *Schloendorff v Society of N. Y. Hosp.* (211 NY 125) where there was no consent whatever to an operation, the court said: "Although the decision in *Schloendorff* was directed at a situation in which absolutely no consent had been obtained we are of the opinion that the rule is equally applicable to a situation where one has been given insufficient information upon which to formulate an intelligent consent. An uninformed or invalid consent is tantamount to no consent at all [citing cases]. An operation performed without an informed consent has been characterized as an 'unauthorized operation'." The court then went on to conclude that the question of fact as to whether there had been an informed consent was for the jury to decide. (Also, see *Di Rosse v Wein,* 24 AD2d 510.) In *Moore v London* (29 AD2d 666) in passing upon the claim of a plaintiff based upon an unauthorized operation, the court said: "In our opinion, whether the paper signed by plaintiff constituted a valid consent to defendant's operation and treatment procedure, under the facts and circumstances here proved, constituted a question of fact for the jury. It was for the jury to determine whether an emergency situation occurred or was present which justified or excused defendant's actions in performing a hysterectomy and Caesarian section when engaged for delivery of a child."

The case of *Canterbury v Spence* (464 F2d 772) a decision of

the United States Court of Appeals, District of Columbia, discussed at length the subject of lack of an informed consent and the consequences thereof. At pages 780 to 781 and 883 of the court's opinion, there is the following:

"True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. From these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by physician to patient to make such a decision possible.

"A physician is under a duty to treat his patient skillfully but proficiency in diagnosis and therapy is not the full measure of his responsibility. The cases demonstrate that the physician is under an obligation to communicate specific information to the patient when the exigencies of reasonable care call for it. * * *

"And it is evident that it is normally impossible to obtain a consent worthy of the name unless the physician first elucidates the options and the perils for the patient's edification. Thus the physician has long borne a duty, on pain of liability for unauthorized treatment, to make adequate disclosure to the patient."

The question has been frequently raised as to whether the duty of the doctor to disclose relevant facts to his patient must be established by expert medical testimony, and, in this connection, it must be noted that there are conflicting decisions in the various jurisdictions which have considered the subject. Some require expert medical testimony. Others do not. The *Canterbury* case *(supra,* p 783) dealt with this problem and the court said: "The majority of the courts dealing with the problem have made the duty depend on whether it was the custom of physicians practicing in the community to make the particular disclosure to the patient. * * * We do not agree that the patient's cause of action is dependent upon the existence and nonperformance of a relevant professional tradition."

And, at page 785, the court went on to say: "We hold that the standard measuring performance of that duty by physicians,

as by others, is conduct which is reasonable under the circumstances."

In our own State the question was considered in *Fogal v Genesee Hosp.* (41 AD2d 468, 473) and the court concluded as follows: "In *Canterbury,* the court held that the duty and scope of disclosure arise apart from medical considerations and are not governed by the profession's standards of due care but by the general standard of conduct reasonable under all the circumstances. This general standard recognizes the patient's prerogative to decide on the projected treatment whereas a medical standard is largely self-serving. We consider the *Canterbury* rule preferable and hold that a doctor is obliged to divulge to his patient the risks which singly or in combination, tested by general considerations of reasonable disclosure under all the circumstances, will materially affect the patient's decision whether to proceed with the treatment."

Later, at page 474, the court said: "The patient may always choose between two apparent dangers, one attendant upon surgery, the other resulting from the continuation of an existing condition because of a decision not to undergo surgery."

*Wilkinson v Vesey* (110 R. I. 606) also held that expert medical opinion is not needed to establish a case based on the lack of an informed consent. At pages 624 to 625 of the opinion the court said:

"We shall * * * join hands with *Canterbury v Spence,* 464 F2d 772 (DC Cir 1972) where the Circuit Court of Appeals ruled that there was no necessity for expert testimony since the jury could determine, without recourse to a showing by the plaintiff of what the medical fraternity in the community tells its patients, the reasonableness or unreasonableness of the extent of a physician's communication with a patient. * * * The decision as to what is or is not material is a human judgment, in our opinion, which does not necessarily require the assistance of the medical profession."

We have also considered the further argument advanced by Dr. Merriam's counsel to the effect that plaintiff failed to prove freedom from negligence.

In *Morse v Rapkin* (24 AD2d 24, 25) this court held that, in an action, such as the one at bar, it was error for the court to charge the jury that: "plaintiff must satisfy them that she was free from contributory negligence in connection with her treatment by Dr. Rapkin, and if not 'she has thereby deprived

herself of any right to a recovery, and you must find against her.' * * * We believe this to be error and it could but mislead the jury. * * * The rule is well grounded." It should be noted that, although the court was of the opinion that the jury's rendition of a verdict in favor of the defendant was amply warranted by the proof, it nevertheless remanded the case for a new trial because of this error. (Also, see, *Schagger v Pfeiffer,* 244 App Div 739.)

Our dissenting colleague, in his opinion, has clearly disposed of the contention that, because the pleadings do not plead a cause of action on informed consent, the issue cannot be considered. We agree with the dissent that the issue was raised at the trial. The court specifically dismissed this claim. We hold that the cause of action, based on lack of informed consent, has been tried and, therefore, the pleadings are deemed amended to conform to the proof.

It must be emphasized that a case, based on lack of informed consent, does not depend in any way on whether the procedure followed by the doctor is proper or improper. As was said in *Darrah v Kite* (32 AD2d 208, 211, *supra):* "As the trespass on the body arises from the unlawful touching itself there need be no showing of negligence or malice and the plaintiff is entitled to any damages which flow from the unauthorized procedure regardless of the fact that the operation was performed with the utmost of care. The damages related to the cause of action for uninformed consent arise not because the procedure was performed unsatisfactorily, but because it was performed at all." (Also, see, "Legal Remedies for Medical Errors", by Melvin Kimmel, § 18.)

It is established law that the dismissal of the action by the trial court at the end of the entire case entitles the plaintiff to every favorable inference which may be drawn from the evidence. On this record the evidence presented at the conclusion of the entire case was clearly sufficient for the jury to have passed upon the issue of whether Dr. Merriam obtained an informed consent, as required by law, and the case should not have been dismissed.

For the reasons above stated the judgment entered on February 27, 1973, dismissing the complaint herein, should be modified on the law and on the facts to the extent of reversing the dismissal as against Dr. George R. Merriam, Jr., and ordering a new trial as to that defendant. In all other respects the judgment should be affirmed, without costs.

STEVENS, P. J. (dissenting). I dissent and would affirm the judgment appealed from. The action was brought by plaintiffs-appellants against the defendants-respondents to recover damages for injuries allegedly sustained by plaintiff, Robert Garone (hereinafter plaintiff) as a result of which his left eye was eventually removed. The action against Roberts' Technical and Trade School, Inc. (Roberts), alleged negligence by Roberts in failing to supply protective safety goggles to plaintiff, a student at the school, by reason of which he sustained an injury to his left eye. The actions with respect to the other defendants were grounded in negligence and malpractice.

At the close of plaintiffs' proof, the trial court granted the motion of defendant the Presbyterian Hospital to dismiss the complaint as to it, and no issue is made by plaintiffs with regard to such dismissal. At the conclusion of the entire case, the trial court granted motions by the several defendants to dismiss the complaint as to them and dismissed the complaint as to such defendants with the exception of Roberts. Subsequently, the jury returned a verdict in favor of defendant Roberts.

On this appeal the majority would reverse and order a new trial as to defendant George R. Merriam, Jr., chiefly, if not entirely, on the issue of informed consent.

In order to determine whether such action (i.e. the dismissal as to Dr. Merriam) was warranted, it is necessary to examine briefly the role played by him in the unfortunate occurrence.

Plaintiff, then age 17 years, claimed that on May 13, 1964, while he was hammering the dents out of an automobile fender, a piece of metal flew from the fender and penetrated his left eye. He had enrolled in the course on February 3, 1964, and completed the course in July, 1964, receiving a certificate of accomplishment.

While there is some conflict in the evidence as to what actually happened on May 13, 1964, as to whether a spark or a sliver of metal struck plaintiff's eye at the school, or whether some foreign object entered his eye on his way to the school, the sequence of events thereafter is fairly well outlined.

Plaintiff was sent to a Dr. Dubinsky, who was dead at the time of trial but whose office record, received in evidence, read as follows: "5/13/64. Spot in front of O.S. [meaning osculi sinistra or left eye]. Conjunctiva clear, cornea clear. Does not stain with fluorescine. Small vitreous floater. Fundus normal.

Advised as to nature of condition and suggested to see private M.D. for further observation."

The then infant plaintiff returned to school the following day and according to his testimony, the pain and bloodshot condition ceased after four or five days. He next saw a doctor in the fall of 1964, when his father took him to see an optometrist, Dr. Leshne, in New Jersey. Plaintiff again saw this optometrist on May 6, 1965, at which time the doctor recommended that he see Dr. Merriam, an ophthalmologist. (In a deposition Dr. Leshne recalled only one visit by plaintiff).

Dr. Merriam saw plaintiff on May 28, 1965, and again on June 24, 1965. Thereafter, plaintiff was admitted to the Presbyterian Hospital on August 17, 1965, under the care of Dr. Merriam. Surgery was performed on his left eye and he was discharged August 26, 1965. Plaintiff claims that he had some vision in his eye prior to the operation, but none thereafter. He next saw Dr. Merriam on September 9, 1965, when drops were prescribed, and again on November 22, 1965, when, plaintiff testified, there was no light perception. On December 27, 1965, he was seen by an associate of Dr. Merriam. Thereafter, on January 3, 1966, plaintiff was admitted to Englewood Hospital and surgery was performed on January 4, 1966, by a Dr. Eisenhauer, who removed the eye.

According to the testimony of Dr. Merriam, then testifying as the plaintiffs' expert witness, when he first saw plaintiff on May 28, 1965, his vision in the left eye was considerably impaired and there was a foreign body at the posterior pole of the eye which was surrounded by a considerable reaction and scarring, with swelling some distance from the foreign body. Photographs and X rays were taken of the eye which showed the foreign body. The foreign body was identified as a metallic object and Dr. Merriam testified that an attempted magnet extraction operation would be the general accepted method of removal, "if necessary, followed by attempt to, directly under direct visualization, to remove the foreign body, which is what we did." It should be remembered that Dr. Merriam was the first eye physician seen by plaintiff and the first visit was almost one year after the occurrence.

On cross-examination, plaintiff, after first denying, recalled that Dr. Merriam told him that he, Dr. Merriam, would first attempt to take the foreign body out by means of a magnet, if that failed, there would be an incision on the eyeball and he would use a forceps or tweezers to extract the foreign body.

Mrs. Garone who usually accompanied plaintiff on his visits to Dr. Merriam, on cross-examination, experienced some difficulty in recalling certain events, but eventually recalled X rays being taken by Dr. Merriam on the first visit; the giving of eye drops to calm down the eye; being told that the eye was in bad shape; that an operation was necessary and that a magnet and possibly tweezers or forceps would be used; that it was a difficult situation because the foreign body had been in the eye for a long time; and, also that, if the foreign body remained, plaintiff would eventually lose the vision in that eye and perhaps the eye itself. The witness knew that not every operation always succeeds but believed this operation would succeed because of her confidence in Dr. Merriam. The witness testified that she would discuss with her husband the results of the visits. Both she and her husband testified Dr. Merriam assured them that Robert would be a new boy after the operation. Mr. Garone said he was not told of any danger or possibility of blindness.

Plaintiffs raise two major points on this appeal with respect to Dr. Merriam: (1) that he advised the use of a magnet prior to hazardous surgery and there was no proof that a magnet was used; (2) there was no proof of an informed consent by plaintiff or his parents to the operation.

As to the use of a magnet, the Presbyterian Hospital record dated June 24, 1965, read, in part: "Advice: Extraction (Magnet) intraocular foreign body O.S. General." On the discharge sheet, dated August 26, 1965, eight days after the operation, there appears in Dr. Merriam's handwriting, the following: "Intraocular Metallic Foreign Body, Left (old) Uveitis, Mild, Left. Op—Attempted Extraction of Foreign Body. Magnet and Direct. Signed-Merriam." Additionally, there was testimony by the doctors and nurse who assisted that a magnet was used. There is no evidence to the contrary. Plaintiffs urge that a report written sometime after the operation by one of the assisting surgeons failed to make reference to a magnet (though it did refer to forceps) and this proves or, at least indicates that a magnet was not used. The failure of the report to make direct reference to a magnet was fully explained. The contention of plaintiffs with reference thereto is rejected. Moreover, there was no expert testimony that a magnet had to be used, or that the failure to use one, if such be assumed, was a deviation, in this case, from accepted

practice, or proximately brought about the result complained of. An unsuccessful operation does not establish malpractice.

While the pleadings did not refer to informed consent, the issue was raised at trial and must be considered. The trial court has discretionary power to permit pleadings to be amended before or after judgment to conform to the evidence (CPLR 3025, subd [c]). When no prejudice is shown the amendment may be allowed during or even after trial *(Dittmar Explosives v A. E. Ottaviano, Inc.,* 20 NY2d 498, 502–503). Indeed, on appeal, the court may *sua sponte* find the facts sufficient to sustain a cause of action other than that pleaded *(Diemer v Diemer,* 8 NY2d 206), or may deem the pleadings amended to conform to the proof *(Di Rosse v Wein,* 24 AD2d 510).

The question then is whether the proof here establishes at least prima facie, a lack of informed consent? In my view it does not.

Since any determination of whether or not there was an informed consent is not dependent solely upon an acknowledgment or admission by the parties involved, all factors relevant to the issue must be considered. In the instant case, these factors would include, but would not be restricted to: the information admittedly received by Mrs. Garone from Dr. Merriam; the reasonableness under the circumstances of an assumption that Mrs. Garone would have transmitted this information to her husband, the infant plaintiff's father; the knowledge possessed by the parents of their son's complaints regarding the continuing pain and the deteriorating condition of his eye; the general awareness of the element of risk in almost any operation — a risk intensified when such a delicate organ as the eye is involved; and, the common knowledge that not every operation is successful.

Mrs. Garone's testimony indicated that she was thoroughly aware of the seriousness of the situation, and the possibility of blindness if the object were not removed. There is evidence that after visits to Dr. Merriam there were home discussions between the plaintiffs and Mrs. Garone. A mere assertion by Mrs. Garone that, despite the obvious and explained risks, she did not believe the operation would not be successful, does not establish a lack of informed consent. In light of Mr. Garone's acknowledgment of home discussions and his knowledge of his

son's complaints, his testimony that he was never "told that there was any risk involved," strains credulity. Mrs. Garone's knowledge, under the circumstances here present, could fairly be imputed to him. Mr. Garone testified he never spoke to Dr. Merriam, but that was taken care of by his wife who would discuss with him what she had discussed with Dr. Merriam. On redirect examination Mr. Garone recalled saying, at an examination before trial, that Dr. Merriam had told the witness and Mrs. Garone that he was "going to use a magnet or something and try to get the foreign body out." Mr. Garone signed the consent order.

The evidence establishes a reasonable disclosure by Dr. Merriam of the risk involved. Disclosure of minute details of the operation could hardly have been warranted or expected. He must only warn the patient of the known risks of the proposed treatment so that an intelligent decision can be made. Expert testimony should be offered by plaintiffs relative to the extent of disclosure required under the circumstances of a particular case, and whether that standard was met (see *Petterson v Lynch,* 59 Misc 2d 469). No such expert testimony was offered. Further, it appears from the record that there was no alternative choice if Robert were not to become blind. With confidence in Dr. Merriam, consent was therefore given. Even if it be urged that there was not a fully informed consent, there is no evidence that such lack or deficiency proximately caused the unfortunate result. Nor is there evidence that this operation was not that customarily performed under like or similar circumstances (cf. *Fiorentino v Wenger,* 19 NY2d 407).

The judgment appealed from should be affirmed.

MURPHY and LUPIANO, JJ., concur with CAPOZZOLI, J.; STEVENS, P. J., and LANE, J., dissent in an opinion by STEVENS, P. J.

Judgment, Supreme Court, New York County entered on February 27, 1973, modified, on the law and on the facts, to the extent of reversing the dismissal as against Dr. George R. Merriam, Jr., and directing a new trial as to that defendant, and in all other respects the judgment is affirmed, without costs and without disbursements.