OPINION OF THE COURT
Stanley L. Sklar, J.
ISSUE
Does a "substitute” physician, administering part of a *681 course of treatment started by a physician for whom he is covering, have an obligation to advise of the risks, benefits and alternatives of that treatment? This court holds that the substitute has that obligation.
FACTS
On January 30, 1978, Dr. Gerald Leventhal consulted with Ms. Josephine Sangiuolo concerning her complaints of joint pain which had been diagnosed as rheumatoid arthritis. A note appears in Dr. Leventhal’s office records for that date reading: "Patient advised of possible Gold complications but agreeable to Rx”. Plaintiff, however, asserts that Dr. Leventhal never told her of the risks of the proposed treatment.
On April 19, 1978, Dr. Leventhal started administering gold injections, utilizing the drug "Solgonal”.
Dr. Jeffrey Postman, at the request of Dr. Leventhal, agreed to cover for Dr. Leventhal during his vacation. Dr. Postman saw Ms. Sangiuolo on June 29, July 6, July 11 and July 17, 1978.
On June 29, Dr. Postman saw her in his office, inquired about her condition, did a urinalysis, which was read as normal, drew blood for a CBC analysis and administered Solgonal. The CBC analysis was later reported as normal.
On July 6, Dr. Postman administered another injection, and did another urinalysis, which was read as normal.
On July 11, Ms. Sangiuolo complained of a rash, and Dr. Postman told her the gold therapy must stop, did not administer any further injections, treated her with several medicines and drew blood for a CBC analysis, which was again ultimately read as normal.
On July 17, Dr. Postman saw her again for an examination and he adjusted her medication. He never saw her again.
THE CLAIMS
Defendant Postman seeks summary judgment, urging that there is no genuine issue of material fact as to the two theories advanced by plaintiff to hold him liable. He is correct as to the first, actual malpractice, and in error as to the second, informed consent.
*682 MALPRACTICE
Plaintiff admits that gold injection therapy is an accepted method of treatment of rheumatoid arthritis. However, she claims that Dr. Postman was negligent in not taking blood for a CBC analysis on July 6, and that such failure was a proximate cause of her severe skin rash. She errs. Defendant claims that a CBC analysis every two weeks was in accordance with good and accepted standards of medical care. However, even if he were in error, the failure to take blood on July 6 could not have been a proximate cause of plaintiff’s rash because the CBC analysis of the blood taken on June 29 was normal, so that he was justified in giving the July 6 injection. The next time he saw plaintiff the rash had already appeared, and he did not administer any further injections.
INFORMED CONSENT
Dr. Postman insists that he relied upon, and was entitled to rely upon the notation in Dr. Leventhal’s chart that Leventhal had advised plaintiff of the possible gold treatment complications, but she nonetheless agreed to proceed. However, a genuine issue of fact is presented in these papers as to whether or not Dr. Leventhal in fact advised Ms. Sangiuolo of the risks of the proposed gold therapy.
The landmark case of Salgo v Stanford Univ. Bd. of Trustees (154 Cal App 2d 560, 578, 317 P2d 170, 181) declared that a "physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment.” (Emphasis added.) Emphasizing the word proposed in the Salgo doctrine, Dr. Postman claims that it was only Dr. Leventhal who had a duty to advise Ms. Sangiuolo of the risks of gold therapy. He urges that this is true because the course of treatment was determined by Dr. Leventhal and he, Dr. Postman, was only following that course. He buttresses the argument by reference to New York decisions which also speak of the obligation to advise of the risks of the proposed treatment. (See, e.g., Garone v Roberts’ Tech. & Trade School, 47 AD2d 306, 317.) He even cites one gold therapy case in which the court held that the doctor "was obligated to make a reasonable disclosure to his patient of the known dangers which were incident to or possible in the proposed use of gold” (Di Rosse v Wein, 24 AD2d 510).
However, closer analysis of the informed consent doctrine *683 and of the cases interpreting it reveals that Dr. Postman proceeded at his peril in relying on an entry of another doctor without himself apprising Ms. Sangiuolo of the risks of gold therapy.
Judge Cardozo stated in Schloendorff v Society of N. Y. Hosp. (211 NY 125, 129) that "Every human being of adult years and sound mind has a right to determine what shall be done with his own body”. The doctrine has been incorporated in Public Health Law § 2805-d (1) (eff in 1975), which says: "Lack of informed consent means the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical practitioner under similar circumstances would have disclosed, in a manner permitting the patient to make a knowledgeable evaluation.”
This statute, which governs this 1976 incident, speaks of the necessity for the person providing the treatment to make disclosure to the patient.
The cases relied on by defendant are inapposite. So, in Fiorentino v Wenger (19 NY2d 407, 417), the Court of Appeals held only that a hospital is not liable for lack of informed consent by a surgeon unless the hospital had reason to know that the patient was unaware of the dangers. Nisenholtz v Mount Sinai Hosp. (126 Misc 2d 658, 663) held that a physician who only refers a patient to another doctor does not become liable if the second doctor performs surgery without informed consent. (See also, Prooth v Wallsh, 105 Misc 2d 603, 606; Graddy v New York Med. Coll., 19 AD2d 426.)
The Prooth case (supra) analyzed the informed consent doctrine as being grounded either in nonconsensual touching of the body akin to assault and battery (citing Schloendorff v Society of N. Y. Hosp., supra), or in the more recent rationale of constituting a variety of medical malpractice.* The Prooth court said that the duty to inform must be limited on either theory. If on the nonconsensual touching theory, only the party actually touching the body or directing such touching should be liable; if, on the malpractice theory, every partici *684 pant in a procedure may be liable to explain the particular risks of his phase of the treatment but not, necessarily, to explain the risks of another participant’s treatment.
The New York courts, and courts of other States, have considered the relationship between the original treating physician and the substitute, in deciding whether the referring physician is liable for malpractice of the substituting doctor. (See, e.g., Impastato v De Girolamo, 117 Misc 2d 786; Prooth v Wallsh, supra; Graddy v New York Med. Coll., supra; Moulton v Huckleberry, 150 Or 538, 46 P2d 589.) A substantial number of factors have been considered in determining what the relationship between the two physicians is, whether master-servant, independent practitioners, etc. In Impastato v De Girolamo (117 Misc 2d, at pp 790-791), the court noted that control is a most important factor in deciding whether the relationship is master-servant. In the instant case, although invited to explore the relationship, the parties do not claim that there is any special relationship between Drs. Leventhal and Postman. We know only that the two doctors have offices in the same building and that Ms. Sangiuolo made payments directly to Dr. Postman. The assumption must therefore follow that Dr. Postman was an independent treating physician. Accordingly, the caveat in Prooth (supra), regarding even the nonconsensual touching theory of failure to secure informed consent, that only the person touching or directing the touching should be liable, does not aid Dr. Postman.
Neither counsel nor the court have found any American case on the issue of the liability of the substituting physician to provide informed consent. However, the rationales that have been considered to underlie the informed consent doctrine mandate this court’s holding that Dr. Postman, as an independent provider of medical care, had the obligation to inform Ms. Sangiuolo of the risks, benefits and alternatives to the treatment that he was going to administer.
Nor am I persuaded that a different holding is required by Dr. Postman’s arguments that (1) he was entitled to rely on Dr. Leventhal’s note, and (2) this holding will make it more difficult for vacationing doctors to secure substitutes.
As to the entitlement to rely argument, if Dr. Postman had no duty to inform, then it does not matter whether or not he relied. However, although he had the duty to inform, that duty may be found to have been met by Dr. Leventhal. If, at trial, it is determined that Dr. Leventhal appropriately *685 warned Ms. Sangiuolo of the risks of the gold therapy, Dr. Postman will be a beneficiary of that finding. If the finding is one of a lack of informed consent then, as noted above, Dr. Postman will have relied on Dr. Leventhal’s entry at his peril. The issue must await trial.
Dr. Postman’s final argument that the imposition of liability on a substituting doctor will make it more difficult for physicians to find others to cover for them is unrealistic. Most "covering” situations involve handling whatever new problems arise, and the covering physician’s duty to inform with respect to new problems is unaffected. Furthermore, the burden of advising of the risks of a continuing course of treatment is minimal.
Summary judgment is accordingly denied.

 The failure to secure a patient’s informed consent is generally now regarded as a "species of malpractice” and is, accordingly, governed by the two and one-half years malpractice Statute of Limitations. (CPLR 214-a; Shaidell, Preparation and Trial of Medical Malpractice Cases, at 5-11 [1981]; see also, Murriello v Crapotta, 51 AD2d 381.) An action involving no consent at all may sound in assault and battery.