Argued July 3, 1962, reargued January 8, reversed and remanded
February 27, petition for rehearing denied April 16, 1963

# WILLARD *v.* HUTSON ET AL

378 P. 2d 966

*Hugh L. Biggs,* Portland, argued the cause for appellants. With him on the briefs were Cleveland C. Cory, Portland, and Paul E. Geddes, Roseburg.

*Randolph Slocum,* Roseburg, argued the cause for respondent. On the brief were Horn & Slocum, Roseburg, and Belli, Ashe & Gerry, San Francisco, California.

Before ROSSMAN, Presiding Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

LUSK, J.

This is an action for malpractice against two physicians in which the jury returned a verdict for the plaintiff for $40,000 compensatory damages and

the defendants have appealed. At the time of the alleged negligent conduct the plaintiff Daniel Willard was an infant eight months old. He was a victim of hemophilia[①] and the charges of negligence relate to the act of one of the defendants in retracting the foreskin of the child's penis, thus causing it to bleed and bringing about the loss of a portion of the organ known as the frenulum, and to the failure of the defendants thereafter to use proper means to stop the bleeding.

The defendants moved for a directed verdict, which was denied. They moved also separately for withdrawal of each of three specifications of negligence which the court submitted to the jury in its charge. These motions were likewise denied. The rulings are assigned as error.

The essential facts are as follows: The plaintiff is the youngest of five children born to Mrs. Alberta Bray. Two of his brothers were suspected hemophiliacs and the mother was informed that her uncle and grandfather were also hemophiliacs. Danny (as he is referred to in the testimony) manifested symptoms of the disease when he was three months old after he began to suck his thumbs and they would bleed and his mother was unable to stop the bleeding. Due to their dire poverty Mr. and Mrs. Bray in February 1957 agreed to the adoption of Danny by Mr. and Mrs. Fay Alvin Willard. Mrs. Willard was informed that Danny was a hemophiliac before the arrangements were completed. The adoption appears to have been authorized by the court on March 8, 1957.

---

[①] Hemophilia is a condition, usually hereditary, characterized by a tendency to profuse and uncontrollable hemorrhage even from the slightest wounds. Webster's New International Dictionary (2d ed).

The defendants J. M. Hutson and A. B. Munroe were physicians and surgeons practicing their profession in Roseburg as partners. Mrs. Bray brought the baby to the defendants' clinic on February 21, 1957. Accompanying her was Reverend Howard E. Baker, a local minister, who was aware that the boys in the family were hemophiliacs. Dr. Munroe examined the baby, found that he was undernourished, his buttocks inflamed and chest "wheezy," and had him taken to the Community Hospital. On this occasion Danny's thumbs were bleeding and had tape on them. Dr. Munroe, according to Mrs. Bray, asked why the baby's thumbs were taped and she told him that she suspected that he was a "bleeder" because he had two brothers at home who were "bleeders." Mrs. Bray never saw her child after that. He remained in the hospital until February 28, 1957, his weight increased and his general condition improved and he was discharged to Mr. and Mrs. Willard.

Thereafter the adoptive mother brought the child to the defendants' clinic for treatment and DPT shots on March 4, 6, 7, April 11, May 24, and June 26, 1957. On the April 11 visit the baby was attended by Dr. Hutson for the first time. On July 26 Mrs. Willard brought Danny to the clinic to be vaccinated for smallpox. Dr. Munroe was not there and Dr. Hutson attended the child. According to Mrs. Willard's testimony, Dr. Hutson vaccinated the child and then the following occurred:

"Instantly after Dr. Hutson had given the vaccination he reached down inside the child's diaper; he did not unpin the diaper; and I couldn't see what he was doing but I could see the movement of his arm and he jerked it back; the child was screaming. I looked at Dr. Hutson and I said, 'What have you done?' He shrugged his shoulders

and then I saw the blood. Danny had a little undershirt on that babies wear and the blood hit the undershirt and I saw it on the diaper and I repeated myself, I said, 'What have you done?' He just shrugged his shoulders and went to the door and started out, and I asked him to please come back and help the child. He did not come back ever again."

Mrs. Willard and the nurse in attendance removed the diaper. The nurse got three other diapers with which they padded the bleeding penis.

The bleeding continued after the child was taken home and that evening about seven o'clock Mrs. Willard called Dr. Munroe on the phone, told him about what had occurred that morning as a result of Dr. Hutson's treatment of the baby and that she thought the bleeding was dangerous because Danny was a bleeder. Dr. Munroe advised her to keep the child quiet and that in a few hours the bleeding would stop. It did not stop and she called Dr. Munroe again and he said to wait a few more hours. The following morning she took the baby to Dr. Munroe's house. After examining the baby Dr. Munroe told her to take the baby to the clinic, where he met them, and Dr. Munroe applied "pressure bandages" as Mrs. Willard put it. They were at the clinic two or three hours. The bleeding continued, however, and on the next day Mrs. Willard called Dr. Munroe again. He told her that he had done all he could for Danny and that she should take him to another doctor. Upon Dr. Munroe's suggestion, the baby was taken to Eugene where, on the evening of Sunday, July twenty-eighth, he was admitted into Sacred Heart Hospital under the care of Dr. Robert Overstreet.

It was Dr. Munroe's recollection that the treatment

on July twenty-seventh was at his home, not the office. He testified that he applied to the affected area an oxidized cotton material called "oxycel," which has the power to cause coagulation and a holding back of blood and that he was successful in controlling the bleeding. He was becoming suspicious, however, that the child was a hemophiliac and on July twenty-eighth inquired of Mrs. Willard about the family history, but she said that she did not know it. Dr. Munroe conceded that he did not have sufficient knowledge of the disease of hemophilia to undertake its treatment and that he would have referred the case to a specialist before he did so had he known that the child was a hemophiliac.

Dr. Overstreet ascertained that the bleeding was from the frenulum. He made a diagnosis of hemophilia. Two transfusions of blood were given the child, one of 200 cubic centimeters and the other of 100 cubic centimeters. The purpose of the blood transfusion is to restore an element of the blood which is present in normal persons but absent in the hemophiliac. Dr. Overstreet, who was called as a witness by the plaintiff, testified that there had been no appreciable loss of blood and no serious injury had been done to the child as a result of his previous bleeding. On August third Danny was discharged from Sacred Heart Hospital. The active bleeding had stopped and the child's coagulation time returned to normal.

Dr. Hutson testified that on July twenty-sixth before the vaccination, which was performed by a nurse, he examined the child and as part of his examination he retracted the foreskin of the penis. It was easily retracted up to the point just before the corona, but then he had difficulty because the lining of the foreskin was adherent to the glans due to adhesions

completely around the coronal area and which prevented him from seeing behind into the sulkus.[2] In order to free the adhesions he applied more pressure and with a quick movement retracted the foreskin the full distance. This had to be done with some force. There was some blood near the frenulum after this manipulation caused by separation of the adhesions; he wiped the blood away with gauze, took away the gauze, and the bleeding seemed to have stopped and he pulled the foreskin down over it. He wrote on the chart "phy neg Smallpox foreskin retracted and adhesions freed." He then left to attend to another patient.

The record shows that at this time Dr. Hutson did not know that Danny was a hemophiliac. He had not been so informed by Dr. Munroe and the child's chart contained no reference to that fact. Dr. Hutson testified that there was "some blood" after the manipulation; evidence for the plaintiff indicated that the child bled profusely.

Mrs. Willard testified that she bathed the child daily and retracted the foreskin and washed it; that she had no difficulty in doing so and had never noticed any adhesions and that this was true on the morning of July twenty-sixth before she took the child to the defendants' clinic to be vaccinated.

At no time prior to July 26, 1957, had either of the defendants observed any adhesions.

---

[2] As explained in the testimony, the glans is the tip of the penis. The purpose of retracting the foreskin is to expose the body of the penis so that it may be cleaned. The frenulum is a band of tissue, perhaps one-sixteenth of an inch in thickness, which frequently binds the foreskin to the end of the shaft of the penis. The corona or coronal ridge is an encircling piece of tissue near the base of the glans and adjacent to a small indentation called the coronal sulkus.

Dr. Munroe was asked whether, in the case of a child of the age of Danny Willard, a mother washing the child can slide the foreskin down if the penis is not affected by adhesions. He answered: "Yes, if there are no adhesions and the foreskin is not tight." He further testified that if the mother washed the baby on the morning of July twenty-sixth "and the foreskin retracted as it had on every other occasion when she washed the child" no adhesions could have occurred between that time and the time she saw Dr. Hutson later in the morning.

Dr. George N. Lenci, a physician and surgeon practicing in Roseburg, testified as follows as a witness for the plaintiff: He examined Danny on July 6, 1961. Normally there is a band of tissue called the frenulum, perhaps one-sixteenth of an inch in thickness, which frequently binds the foreskin to the end of the shaft of the penis. The frenulum was not present and in this area below the corona there was a faintly visible scar approximately one-half an inch in length and about one-eighth to a quarter of an inch in width. A few small blood vessels, capillaries, were clearly visible in the upper part of the scar. Dr. Lenci was asked a lengthy hypothetical question which contained a recital of most of the facts in evidence, including a summary of the case of Danny Willard taken from the chart of the Sacred Heart Hospital. Among other things, the summary stated:

"He was given a transfusion of blood which was some ten days old or more. This immediately stopped the active bleeding and restored the coagulating time to normal."

On the basis of the facts stated in the hypothetical question Dr. Lenci was asked whether he had an opinion as to whether the defendants "in the diagnosis,

treatment and care of the infant child in question did or did not meet those standards of care usually employed by reputable physicians and surgeons practicing a general practice in the community of Roseburg, Oregon, in the diagnosis, care and treatment of the private parts, to-wit, the penis of the infant in question?" The witness answered that he did have such an opinion and testified that in the hypothetical case the physicians did not observe "the standards in this community in regard to this little hemophiliac youngster. I feel that any kind of manipulation that resulted in a tearing of the skin or frenulum, anything that might produce an injury to this youngster should have been omitted." He based his answer in part, at least, on the fact that the history of hemophilia in the family was apparently known to the treating doctors. He was next asked whether, in his opinion, the physicians in their treatment of the patient after the initial injury met the standards of care in the community. He answered:

"My opinion is that an attempt should have been made to find out why the bleeding persisted. Usually blood-clotting takes place within a few minutes times [sic] and if it is prolonged beyond five or ten minutes I would be concerned about it. It is all right to treat the immediate bleeding, which in the hypothetical case I judge was done but, as far as I can tell, no attempt was made to find out why the bleeding persisted, and this went on for several days, I believe, before the youngster was referred to a specialist in Eugene."

He testified that the cause of the initial bleeding was the forcible drawing back of the foreskin.

The defendants maintained a laboratory with facilities for testing blood to determine coagulation time and clotting time. No such tests were made of the

plaintiff's blood. Dr. Overstreet testified as follows with respect to the treatment of hemophilia:

"Q Doctor how many ways are there with any degree of practicality to stop a transfusion or— I am sorry—a hemorrhage in a hemophiliac?

"A Oh, there are many ways, depending on the location, how easy it is to apply a tourniquet and how easily one can apply pressure. But the prime requisite is usually whole blood or some fraction of whole blood.

"Q As a matter of fact, is that the common method of stopping bleeding?

"A Yes; I think though that it might be said that bleeding tends to stop if blood loss is not great after a period of several hours, days, and a minor oozing will stop by itself spontaneously."

The case was tried upon the fifth amended complaint in which, after deletions and amendments made on the trial, the defendants were charged with negligence in the following particulars:

"1. Negligently, carelessly and recklessly manipulating and tearing the penis of the plaintiff in a manner such as to cause it to bleed, in view of the knowledge of the defendants of the disease of hemophilia from which plaintiff suffered and still suffers.

"2. In negligently, carelessly and recklessly failing to properly attend to the bleeding of plaintiff.

"3. In negligently, carelessly and recklessly failing to diagnose the condition of hemophilia in plaintiff after defendants had started him to bleed and in leaving the care of plaintiff to his mother."

It was alleged that as the result of these acts of negligence the plaintiff suffered physical and mental pain, and atrophy of the frenulum of the penis and scarring thereof.

In support of their motion for a directed verdict the defendants say that there is no substantial expert testimony to support any of these charges.

■ There is evidence that the act of Dr. Hutson in forcibly retracting the infant's foreskin caused bleeding which the defendants were unable to control, loss of the frenulum and a scar which remained at the time of the trial. It is conceded in the defendants' brief that as early as February, 1957, the defendants knew, or should have known, that plaintiff was a hemophiliac, but it is insisted that the uncontradicted medical testimony shows that on July 26, 1957, the plaintiff suffered from adhesions and that the foreskin could be retracted only to a point just before the corona and that the answer of Dr. Lenci to the hypothetical question put to him is entitled to no weight as evidence because the question did not assume the presence of adhesions. We cannot agree with this contention because we think that there was competent evidence that there were no adhesions on July 26, 1957. The jury could have found from the expert testimony of the defendants themselves that Mrs. Willard could not have retracted the foreskin as she said she did were there adhesions present and hence could have found that there were none. Moreover, Mrs. Willard testified, without objection, that there were no adhesions. It is asserted by the defendants that this was a medical fact "beyond the ken of laymen." Reference is made to *Nation v. Gueffroy,* 172 Or 673, 142 P2d 688, 144 P2d 296, in which case there was a total absence of expert testimony as to the standard of care to be employed by a physician in treating the plaintiff's injury and a directed verdict for the defendant was sustained. The decision applied the established rule in this class of cases. *Ritter v. Sivils,* 206 Or

410, 413, 293 P2d 211; 41 Am Jur 240, Physicians and Surgeons, § 129. But it was also said in *Nation v. Gueffroy* that there are "some things of a non-technical nature occurring in the practice of medicine and surgery which a layman might well comprehend and understand. Under such circumstances, the juror needs no expert witness for his guidance and enlightenment." 172 Or at 680.

According to Dr. Munroe's testimony "[a]dhesions are caused by an irritation between any two surfaces of the body which might come in contact or might lie in contact." In the medical dictionaries an adhesion is thus defined:

> "The process of adhering or uniting of two surfaces or parts, especially the union of the opposing surfaces of a wound." Stedman's Medical Dictionary, Unabridged Lawyers' Edition.

> "The joining of parts to each other, which may occur abnormally. 2. Any fibrous band or patch by which parts abnormally adhere." Dorland, The American Illustrated Medical Dictionary (22nd ed).

Webster's New International Dictionary (2d ed) defines adhesion:

> "Union of surfaces normally separate by the formation of new tissue resulting from an inflammatory process."

There was no direct evidence upon the question whether adhesions such as are described by the testimony in this case are recognizable by a non-expert. We pass the point of admissibility of lay testimony as to their existence in ordinary circumstances. We think that the question was for the jury in this case for two reasons, first, the testimony came in without ob-

jection, and second, Mrs. Willard testified that she retracted the infant's foreskin without difficulty and the medical testimony is to the effect that she could not have done so had adhesions been present. Hence, Dr. Lenci's answer to the hypothetical question was entitled to be given weight, notwithstanding the question did not assume the presence of adhesions.

■ In this view, the argument based on the fact that Dr. Lenci testified that the freeing of adhesions on the penis of a known hemophiliac would be a matter of judgment with the treating physician avails the defendants nothing on their motion for a directed verdict. It should be noted, however, that Dr. Lenci also testified that there would have to be extremely good reasons for doing so and he could think of no such reasons in the particular case and, moreover, that retraction in such a case should be accomplished by the use of a blunt instrument rather than by the method used by Dr. Hutson. The rule that a physician or surgeon is not liable for an honest error or mistake of judgment is not ironclad, but exempts from liability only when there is a reasonable doubt as to the nature of the physical condition involved or as to the proper course to be followed or where good judgments may differ. *Moulton v. Huckleberry,* 150 Or 538, 546, 46 P2d 589. Even on the assumption that, as the defendants claim, the only competent evidence in the case shows the presence of adhesions, the contention that whether or not to retract the foreskin was in the circumstances a matter of judgment could not be sustained, for Dr. Hutson testified, and there is no evidence to the contrary, that he did not know that the infant was a hemophiliac. Yet that there is evidence that he should have known is conceded by the defendants. Hence, there was no occasion for him to exer-

cise judgment with respect to the existence of that condition.

It is also argued that there is no evidence that the negligence of the defendants was the proximate cause of the atrophy of the frenulum and the scarring of the penis. It is not claimed that these injuries were not the result of the retraction of the penis by Dr. Hutson, but simply that they were not caused by any negligence of Dr. Hutson in performing the retraction. The brief says:

> "If the plaintiff had not been a hemophiliac and prone to bleeding, the doctors properly could have retracted his foreskin which could have resulted in some tearing of the frenulum with resulting loss of the frenulum and scarring, without having violated any duty to plaintiff. There is no evidence in this case that the technique employed by the defendants was improper, that the force used was excessive, or that the resulting slight tear at the base of the frenulum was negligently caused."

But Dr. Hutson testified that he used "some force," Mrs. Willard testified that he "jerked" his hand back and if, as the jury could have found, there were in fact no adhesions, they could have further concluded that he used more force than was necessary. Moreover, if the jury believed Mrs. Willard's testimony, quoted above, they could have found that Dr. Hutson retracted the foreskin without even seeing the penis. The defendants' medical witness, Dr. John H. Donnelly testified that good practice in the community required additional care and concern in the treatment of a hemophiliac when doing a retraction of the foreskin. A finding that this standard was not met by the defendants was justified under the evidence. We think that the question whether the loss of the infant's

frenulum and the scarring of the organ were due to the defendants' negligence was for the jury.

■ The second specification of negligence is that the defendants failed properly to attend to the bleeding of the plaintiff. With this should be considered the allegation in the third specification that the defendants were negligent in leaving the care of plaintiff to his mother. We view these allegations, as do the parties, as a charge of improper treatment. A further specification that the defendants were negligent in failing to refer the case to a specialist was stricken by the court on motion of the defendants. We think, however, that the second specification of negligence is broad enough to include this charge.

Whether a physician or surgeon has exercised the requisite degree of skill and care in the treatment of his patient is, in the generality of cases, a matter of expert opinion. *Ritter v. Sivils,* supra. It is the position of the plaintiff that the requirements of this rule are satisfied by the testimony of Dr. Overstreet that bleeding in a hemophiliac is stopped or controlled through blood transfusions. It is argued that no effective treatment was administered by the defendants and that if Dr. Munroe had been familiar with the disease, or if he had referred the child to a specialist, proper treatment would have been administered two days earlier than actually occurred and the child spared two days of bleeding.

The defendants argue that there is no medical testimony as to how long a physician might properly wait, in circumstances such as appear in the present case, before giving a transfusion or calling in another physician skilled in the treatment of hemophilia.

The contention calls for an analysis of the medical testimony.

Dr. Overstreet testified that when he first examined the plaintiff he found "[a]n active, vigorous, irritable baby boy of good color with slight oozing from the foreskin, the exact site not determined." He next did laboratory work which "disclosed that the youngster had not lost an appreciable amount of blood" and then gave him a transfusion. He took a history of the child which included the period of 48 hours or more following the inception of the bleeding. He testified, as we have seen, that to stop bleeding in a hemophiliac "the prime requisite is usually whole blood or some fraction of whole blood" and that this was the common method, but he added that "bleeding tends to stop if blood loss is not great after a period of several hours, days, and a minor oozing will stop by itself spontaneously."

He was not asked the critical question, namely, what, under the appropriate standard of care, was the proper treatment to have been administered during the 48-hour period, nor was that question put to Dr. Lenci or to Dr. Donnelly.

That the plaintiff suffered no "appreciable loss of blood" is established beyond dispute by the only competent medical testimony in the record. It is true that Mrs. Willard testified in substance that there was copious, uninterrupted bleeding during the 48-hour period, but the testimony of Dr. Lenci, as well as of Dr. Overstreet, demonstrates that Mrs. Willard's testimony in this regard was a gross, if natural, exaggeration. Based upon Mrs. Willard's testimony, Dr. Lenci was asked the following question by counsel for the defendants:

"Doctor, if you would assume now this fact for this limited question that the child immediately upon the freeing of the foreskin or the retraction

of the foreskin spurted blood—meaning pulsations—spurted blood clear up on his undershirt and then filled two or three diapers before it ever left the office and continued to spurt blood, to flow copiously, from the 26th day of July, in the morning, until the 28th day of July, in the evening. What would you have expected the child's condition to be upon arrival at the Eugene Hospital?"

The witness answered:

"I would say in this hypothetical case which you described the youngster probably wouldn't have lived that long."

The question which the jury was called upon to decide was, not merely what is the standard treatment for bleeding of a hemophiliac in the generality of cases, but whether, in the circumstances of the particular case, the defendants were negligent either in failing to give that treatment during the 48-hour period or in not referring the case to a specialist. If it be assumed that the child had been under the care of a physician like Dr. Overstreet, possessing the requisite knowledge and skill in the treatment of hemophilia, and that he, believing reasonably that the bleeding was not severe and was not endangering the child's health, and with his knowledge that "bleeding tends to stop if blood loss is not great after a period of several hours, days, and a minor oozing will stop by itself spontaneously"—if such a physician in these circumstances had waited over a period of two days to see if the bleeding would stop without a transfusion, would a jury be warranted in finding him negligent in the absence of expert evidence that his treatment was improper? We think not. The defendants were entitled to have their conduct measured by the same standard that would be applied to the conduct of a

specialist. The question whether Dr. Munroe should have called in a specialist was a medical question. *Seneris v. Haas,* 45 Cal2d 811, 828-829, 291 P2d 915, 53 ALR2d 124. As the record contains no medical testimony that the treatment by the defendants was negligent in the circumstances of this case we think that it was error to submit that charge to the jury.

The third charge of negligence is failure to "* * * diagnose the condition of hemophilia in plaintiff after defendants had started him to bleed * * *." We need not labor the point that there is evidence to support this charge. A mere mistake in diagnosis is not actionable where the physician uses the proper degree of care and skill. *Moulton v. Huckleberry,* supra, 150 Or at 545-546. In that case a doctor was found to be negligent because he failed to use a simple well-known test for determining the nature of an injury to the plaintiff's leg. So here the medical evidence shows that it was the duy of the defendants to have tried to ascertain the reason for the continued bleeding and particularly whether there was a history of hemophilia in Danny's family, a factor of the utmost importance, according to Dr. Overstreet, in diagnosing the cause of the bleeding. No such effort was made. Besides, there was evidence on behalf of the plaintiff that Dr. Munroe had been advised that there was such a history in Danny's family. If the jury believed this testimony they could have found the need for all the more diligence on the part of Dr. Munroe to discover the nature of the ailment he was attempting to treat.

It is to be borne in mind, however, that a wrong diagnosis to be actionable must not only be negligent, but must also be followed by improper treatment to the injury of the plaintiff. *Skodje v. Hardy,* 47 Wash2d 557, 288 P2d 471; *Hester v. Ford,* 221 Ala

592, 130 S 203; 41 Am Jur 210, Physicians and Surgeons § 93. On the present record, therefore, with its complete lack of competent evidence of improper treatment, the question of diagnosis became immaterial.

The motion for a directed verdict was properly denied, but submission of the second specification of negligence to the jury was reversible error.

Two other assignments of error raise questions which are likely to arise on another trial and will therefore be considered.

The defendants excepted to the giving of the following instruction:

"In this case, if you award damages to the plaintiff—and again I caution you: I do not mean to imply you should or should not—you are entitled to consider the present purchasing power of money in arriving at the amount of damages."

A number of courts have approved an instruction of this kind. The Wisconsin court adequately stated the ground of these decisions as follows:

"Counsel concede that this court in *Zeinemann v. Gasser* (1947), 251 Wis. 238, 247, 29 N. W. (2d) 49, considering whether damages awarded by a jury were excessive, said:

" 'The jury had a right to award damages based on economic conditions existing at the time the verdict was rendered, and this court will give recognition to economic conditions in reviewing verdicts so rendered.'

"However, counsel contend that there is a valid distinction between a rule which permits the jury to take into account economic conditions and one which upholds a trial court in admonishing a jury in its instructions that it should take into consideration the depleted value of the dollar.

"The rules guiding a jury's deliberations are to be given in the form of instructions by the trial court and should cover all material phases of the jury's work applicable to the particular case. It is rather startling to suggest that the court ought to withhold an instruction from the jury so that it might remain ignorant of its rights and duties in the case submitted to it.

"While the court might have omitted from the instruction the words 'depleted' and 'lessened' in order that the instruction have more universal application, the inclusion of those terms was not prejudicial error since there is a clearly lessened purchase power in the dollar at the present time." *Dabareiner v. Weisflog,* 253 Wis 23, 29-30, 33 NW2d 220, 12 ALR2d 605.

See, also, *New Amsterdam Casualty Co. v. Soileau,* 167 F2d 767 (5th Cir. 1948) 6 ALR2d 128, cert den 335 US 822, 69 S Ct 45, 93 L ed 376; *Risley v. Lenwell,* 129 Cal App 2d 608, 277 P2d 897; *Gist v. French,* 136 Cal App 2d 247, 288 P2d 1003; *Chadek v. Spira,* 146 Cal App 2d 360, 303 P2d 879; *Guerra v. Balestrieri,* 127 Cal App 2d 511, 274 P2d 443; *Smith v. Illinois Central Railway Co.,* 343 Ill App 593, 99 NE2d 717; *Halloran v. New England Tel. & Tel. Co.,* 95 Vt 273, 115 A 143, 18 ALR 554. In numerous cases the courts, in reviewing verdicts claimed to be excessive or inadequate, have taken into consideration the current purchasing power of the dollar (see Annotation, 12 ALR2d 611, 614 et seq.); and in numerous others have said that the jury was authorized to do likewise. *Wiest v. Twin City Motor Bus Co.,* 236 Minn 225, 52 NW2d 442; *Normand v. Thomas Theatre Corp.,* 349 Mich 50, 84 NW2d 451; *Garrett v. Taylor,* 69 Idaho 487, 210 P2d 386; *Bardack v. Extract,* 13 NJ Super 350, 80 A2d 570; *Moore v. Public Service Coordinated Transport,* 15 NJ Super 499, 83 A2d 725; *Fort Worth &*

*Denver City Ry. Co. v. Gifford* (Tex Civ App) 252 SW2d 204; *Bethke v. Duwe,* 256 Wis 378, 41 NW2d 277; *Shields v. Buffalo County,* 161 Neb 34, 71 NW2d 701 (the court cited *Segebart v. Gregory,* 160 Neb 64, 69 NW2d 315, in which the court held that the jury could consider the matter but that it was not a proper subject for an instruction); *Holz v. Pearson,* 229 Minn 295, 39 NW2d 867. Arguments addressed to the jury based on the change in the purchasing power of money were approved in *Washington & R. R. Co. v. LaFourcade,* 48 App DC 364; and *Halloran v. New England Tel. & Tel. Co.,* supra.

▉▉ It has not been contended in argument that the jury, in assessing damages, should exclude from their consideration the present value of the dollar; but it is said that the jury might take the instruction as a suggestion from the judge to bring in a large verdict— one not warranted by the evidence. We are not persuaded that the instruction would have this effect. We think, however, that it would not be error to refuse the instruction because, as the court said in *Gist v. French,* supra, it is hardly necessary to remind a jury of the diminished purchasing power of the dollar, as the jurors are reminded of it almost daily when they purchase the necessaries of life. See, to the same effect, *Rebholz v. Wettengel,* 211 Wis 285, 248 NW 109.

We hold, therefore, that the court did not err in giving the instruction complained of.

▉ For similar reasons the court could properly refuse to give the following instruction requested by the defendants:

"I instruct you that the theory of damages is compensation and not punishment. You should be concerned, therefore, if you come to a consideration

of the issue of damages, merely in awarding to the plaintiff such sums as would justly and fairly compensate him for his damages, if any, without thought of punishing or penalizing defendant doctors."

While it would not have been error to give this instruction, *Brown v. McCloud,* 96 Or 549, 190 P 578, neither was it error to omit it, because there was no issue of punitive damages. *Walkup v. Beebe,* 139 Iowa 395, 116 NW 321; *Roach v. Wright,* 195 Ala 333, 70 S 271; *San Antonio Traction Co. v. Davis* (Tex Civ App) 101 SW 554; *Western Union Tel. Co. v. Waller* (Tex Civ App) 47 SW 396. The court made it clear in the charge that damages were to be awarded only as compensation for the injury sustained. The requested instruction is purely cautionary in its nature, the giving or refusal of which lies within the sound discretion of the trial judge.

The defendants have also assigned as error the court's denial of their motion for a new trial based on the alleged misconduct of a juror. In view of our disposition of the case, it will be unnecessary to pass upon this question.

The judgment is reversed and the cause remanded for further proceedings in conformity with this opinion.