Karen M. GOWAN, Guardian and CONSERVATOR FOR Jerry M. GOWAN, protected person, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Civ. No. 83–1703–RE.

United States District Court, D. Oregon.

Jan. 22, 1985.

---

Dennis H. Elliott, Stephanie S. Freedman, Elliott & Freedman, Portland, Or., for plaintiff.

Charles H. Turner, U.S. Atty., Jack C. Wong, First Asst. U.S. Atty., Herbert C. Sundby, Asst. U.S. Atty., Portland, Or., for defendant.

## OPINION

REDDEN, District Judge:

This action was brought by Karen M. Gowan in her capacity as guardian and conservator for her father, Jerry Gowan, against the Veterans Administration Hospital for psychiatric malpractice.[1] Jerry presently suffers from severe dementia due to prolonged cerebral anoxia. Cerebral anoxia is the deprivation of oxygen to the brain which, if sustained in excess of four minutes, will result in brain cell necrosis and irreversible damage. Jerry's condition is the result of an unsuccessful attempt at suicide by hanging on November 17, 1982. Jerry, who will never again be a productive

---

1. There are five Gowans who will be frequently mentioned herein and, for clarity, given names will be used. Jerry and Karen have already been identified. Anne is Jerry's mother, Teddy is his wife and Jeff is his fourteen year old son.

citizen, is presently cared for at the Oregon State Hospital. It is necessary for him to remain in that, or a similar facility for the rest of his natural life. Jerry's life expectancy has not been shortened by his condition.

Jerry was admitted to the Providence Hospital psychiatric unit on June 8, 1982, and discharged on June 22, 1982. On June 30, 1982, he was admitted to Ward 5A of the Veterans Administration (VA) Hospital because he could not afford the high cost of private care at Providence. Ward 5A is the psychiatric unit of the VA facility in Portland. Throughout the summer and fall of 1982 Jerry was admitted and discharged from the VA facility on three separate occasions:

1. Admission June 30, 1982
   Discharge August 13, 1982
2. Admission August 17, 1982
   Discharge September 17, 1982
3. Admission October 1, 1982
   Discharge November 12, 1982

His attempted suicide was on November 17, 1982, five days after his third discharge. Plaintiff challenges the adequacy of the treatment as well as the inadequacy of the planning prior to the final discharge.

## BACKGROUND

For most of his adult life Jerry had been a successful businessman employed in the lumber industry. In 1971 he began working for Boise Cascade as a plywood salesman, and by 1977 he had progressed to a management position. His annual earnings in 1979 exceeded $50,000 and had been in that general area for several years.

He had two children by his first wife who died in 1966. This was a serious blow to Jerry, but one from which he had recovered. In 1968 Jerry married a co-worker, Teddy, and they had a son, Jeff, in 1970.

The first record of Jerry's emotional problems surfaced in 1974 when he reported problems with impotence to his family physician. A physical examination indicated that Jerry, then 46 years old, had the lung capacity and endurance of a 70 year old man. He was overweight, smoked heavily, drank to excess and rarely exercised. He was instructed to change his lifestyle but did not do so at that time. However, he did quit smoking and drinking in 1982 prior to his admission to Ward 5A. His problem with impotence continued and at the time of his first admission for psychiatric care he was totally impotent.

In 1980 and 1981 Jerry's personal problems escalated. He was terminated from his management position at Boise Cascade in 1981. Although he was offered a sales position (which was considered a demotion) Jerry rejected that option. Instead he purchased a small floor covering business in the fall of 1981. The business was unsuccessful from the beginning and ultimately failed.

During these troubled times Jerry and Teddy's marriage began to falter. Divorce was discussed in the spring of 1982 in conjunction with a possible bankruptcy filing. Jerry began to become depressed and unable to function effectively in a routine daily fashion. The family's financial resources became strained in late spring 1982. The marriage problems continued to deepen and Jerry's depression worsened. By June 1982 Jerry was hospitalized, and as previously noted, he remained hospitalized almost continuously until his suicide attempt in November 1982.

While Jerry was in the hospital Teddy began to seriously consider divorce. She spoke with the hospital staff and Jerry about ending the marriage. She became involved with another man and, at one point, told Jerry of the affair. Teddy testified that she thought that this revelation might shock Jerry into reality and force him into taking some positive action towards recovery. By the end of the summer Teddy had decided that the marriage was over and informed Jerry that she wanted a divorce. She filed for divorce in October 1982, but then withdrew the petition following the suicide attempt.

On each of his admissions Jerry was diagnosed as severely depressed. He was also considered a suicide risk and on two of

his admissions to the VA facility he had been put on "close" status. Close status requires the patient to remain in pajamas and under certain restrictions which will discourage departure and avoid suicide. Prior to his first admission to Providence, Jerry was found with an empty gun in one hand and bullets in another. Additionally, while he was at Providence he "slashed" his fingertips, sustaining a minor injury. He discussed death and suicide with other patients while at the VA facility. Some of these remarks and conversations were passed along to the staff. During his last hospitalization he asked patients to obtain cyanide for him. These requests were conveyed to the hospital staff and Jerry was promptly placed on close status on October 29, 1982. He was removed from that status on November 2, 1982, and discharged ten days later on November 12, 1982. As noted above, his suicide attempt occurred on November 17, 1982. It is noteworthy that the final attempt at suicide was the first actual attempt he had made to kill himself.

### TREATMENT AND DISCHARGE

Plaintiff's case alleges negligence in one or more of several areas. First, plaintiff claims that although the Veterans Administration prescribed the correct medication, they did not prescribe sufficient dosages, nor did they continue those dosages for a sufficient length of time. Secondly, it is alleged that the Veterans Administration negligently failed to prescribe electro-convulsive therapy. Thirdly, plaintiff claims that the Veterans Administration failed to provide adequate psychotherapy while he was hospitalized. Finally, plaintiff alleges that the VA failed to live up to the standard of care in planning Jerry's final discharge. As to the latter claim, it is plaintiff's theory that Jerry should not have been discharged at that particular time, that if he was to be discharged then it should have been to a group home, and that the discharge to his 76 year old mother was made without adequate evaluation and instructions to her.

### MEDICATION

Trazadone was prescribed for Jerry at Providence Hospital and he was still on that medication when admitted for the first time to the VA facility on June 30, 1982. He was continued on Trazadone throughout his first stay and after that discharge. When he returned and asked for readmission on August 17, 1982, Trazadone was discontinued. Defendant's agents testified that apparent liver problems, coupled with his improvement, prompted the decision to discontinue the medication. He was discharged for the second time on September 17, 1982 and again readmitted on October 1, 1982. When admitted on the third occasion, Imiprimine was prescribed and Jerry remained on that medication until the time of his suicide attempt. Plaintiff contends that Trazadone was appropriate, but that the amount should have been increased over the treatment period and that it should not have been withdrawn on August 17th. Plaintiff claims that it is well known that Trazadone cannot damage the liver and equally well known that such a medication should be continued and, that under the circumstances here, the dosage should have been increased. Knowledgeable and reputable physicians testified contra on this point.

■ The most significant testimony was that the dosage given followed the Physicians Desk Reference (PDR). This work is a recognized authority in the medical profession and consistently followed by physicians and surgeons in prescribing medications. It was not malpractice for the VA staff to follow the recommendations of the PDR.

■ Plaintiff failed to sustain the burden of proof that insufficient amounts of Trazadone were given and also failed the burden of proof that it was negligent to discontinue the treatment, and give no alternative medication for the period August 17, 1982 to October 1, 1982. The physicians who made the decision to discontinue the Trazadone properly believed that it might have an unfortunate and secondary

effect on the liver. They also noticed that his condition had improved and continued to improve while he was off medication during his second hospital stay. It was only when Jerry presented himself for his third admission on October 15, 1982, that the doctors noted any deterioration in his condition. He was then immediately started on the Imiprimine treatment. I also note that during the period between his second and third hospital stays at the VA facility, and while he was not on any medication, Jerry stayed at home in the care of his daughter. It was at this time that he became concerned about harming himself and sought help at the VA by asking for readmission.

## ELECTROCONVULSIVE THERAPY

Plaintiff also claims that defendant is negligent for failing to consider or prescribe electroconvulsive therapy (ECT). The plaintiff's theory is that Jerry's improvement, as charted, was so insignificant that ECT should have been considered and prescribed. Defendant's agents testified that they did consider such treatment, but concluded it was not warranted. They also contend that Jerry did show improvement during each stay. The records do not reflect their decision regarding ECT, but I have no reason to believe that defendant's agents were untruthful. I believe that it was discussed and considered, and that the appropriate decisionmakers rejected that option.

█ ECT is not available at the Portland unit and plaintiff would have found it necessary to travel to Roseburg for such treatment. ECT is not in disrepute as a treatment, but it is agreed that it is not used to the extent that it was several years ago. Failure to require the treatment was not malpractice. As is the case in all other areas, respected and competent physicians testified on each side of this issue.

I find that plaintiff has failed to sustain the burden of proof on this theory.

## PSYCHOTHERAPY

Although plaintiff alleged defendant's failure to provide adequate psychotherapy while Jerry was hospitalized, there was a paucity of evidence supporting this theory. The staff at the VA facility uses a "team approach" utilizing different disciplines within the mental health field. Dr. David Reaves, Chief of Inpatient Care, testified that in 1982 Ward 5A had two treatment teams. Each team was responsible for approximately twelve to fifteen patients, and was composed of a staff psychiatrist, a psychiatric resident doctor, a psychology intern, two medical students, two registered nurses and two or three nursing students. Ward 5A also employed a full time psychiatric social worker who was not a member of either team, but assisted all patients and staff as needed.

Each member of the team participated in the patient's treatment; however, one team member was designated the case manager. Jerry's case manager was Janelle McLeod, a registered nurse with a Master's Degree emphasizing mental health care. Ms. McLeod had the primary responsibility for "one-on-one" discussion sessions with Jerry and with coordinating his treatment with other team members.

There was a weekly therapy schedule for Ward 5A that was more or less followed by all patients. On Mondays treatment review group was held. Here the patients were able to review and assess their treatment and progress from their own point of view. Tuesdays and Thursdays were devoted to skills group meetings. The patients participated in either a communication or a daily living skills group depending upon their individual level of recovery. Also, ward government meetings were held on Tuesdays and Thursdays. Ward government is a procedure whereby patients are encouraged to become involved in the treatment of fellow patients, such as evaluating another patient's pass request.

Wednesdays and Fridays were spent in the more traditional type psychotherapy groups, with the patients discussing their problems and the staff offering advice and

encouragement. There was also time set aside throughout the week for staff and team meetings. This type of therapeutic approach, wherein other patients as well as the staff participate in group sessions, is termed "milieu" therapy.

There was some criticism of the team's resident physician, Dr. Rosen, by a student nurse but, generally, plaintiff's witnesses did not fault the team approach. They did testify to the obvious: that the combination of treatment was not ultimately and completely successful. However, an unsuccessful result does not mean a doctor has committed medical malpractice. *Willard v. Hutson*, 234 Or. 148, 378 P.2d 966 (1963); *Moulton v. Huckleberry*, 150 Or. 538, 46 P.2d 589, 592 (1935). All experts testified that complete success or a "complete cure" rarely occurs by the time of discharge for any severely depressed patient.

Again, plaintiff failed to sustain the burden of proof on this issue.

### DISCHARGE

Plaintiff's strongest theory for recovery is that the defendant failed to perform its duty to provide an adequate discharge plan, and that its failure to so do was a substantial contributing factor to the attempted suicide. Some additional background information is needed here.

Jerry's first two discharges were to Teddy and he attempted to live at the family home with her and Jeff. It must be recalled that even prior to the first hospitalization this marriage was a troubled one and divorce had been discussed. Teddy desired a divorce and Jerry was strongly opposed to one. According to VA staff, Teddy was giving "mixed signals" to Jerry because she told him she desired divorce, but continued to visit him and to provide encouragement and support to him. One can be somewhat critical as well as sympathetic to Teddy and her conduct and dilemma. In any event, she finally filed for divorce prior to the third admission and made it clear that Jerry should not be discharged to her or their home.

It was felt by the treating team members that a final decision regarding divorce was necessary so that Jerry would finally realize he must rebuild his life independent of his marriage. The filing of the divorce was not regarded by those involved as a signal that Teddy would no longer be involved in Jerry's support structure.

In preparation for discharge, Jerry visited and evaluated several group care homes. These are residences where one or more individuals live in a somewhat structured environment with others who might have similar adjustment problems. Typically, a lay person rents rooms to such individuals and, for a monthly payment, provides bed, board and limited support. Jerry did not desire to be discharged to such a home. The staff felt he rejected it partially because this would admit the end of his marriage. Further, all witnesses agreed that Jerry did not feel he needed such support, and that this failure to recognize his needs was one of his problems. In any event, Jerry visited several homes and rejected all but one. The one which he selected did not accept him. He chose that placement because it was the least expensive.

Finally, Armine Balloun, who was supervising this part of the discharge plan, discussed another care facility. This one, referred to as the "Tupper" home, was under consideration by Jerry when Ms. Balloun left on a short vacation. Although Jerry had not rejected the "Tupper" option, it was clear that he was not enthused about the prospect. Then, shortly before the third discharge, Jerry, Teddy and Anne came up with their own plan which would see Jerry discharged to live in Chehalis with Anne, his 76 year old mother. It was understood that his base of operations would ultimately be Portland, and that he would travel from Chehalis to Portland at least twice a week for out-patient care and to seek employment. All three of these individuals urged this plan of action. Again, it is to be remembered that Teddy was still active in this phase of the decision-making process.

Anne was aware of her son's problems and knew that he had been hospitalized on several occasions for a severe depressed condition. She had visited him in the hospital and at his home while he was on furlough or between admissions. All of the team, except Ms. Balloun who was on vacation, expressly approved the plan. Upon her return, Ms. Balloun discovered what occurred and could find no fault with the decision. At the time of discharge all members of the team thought that this option was superior to a group care home. Although Jerry was not enthusiastic about anything, he did express satisfaction with this plan.

With the encouragement of team members, Jerry had written of his plans and schedule which would follow discharge. His plans concentrated on the area of obtaining employment. He was receiving unemployment compensation and was not desperate, but employment was necessary both for his support and for his ultimate recovery.

None of the VA personnel talked to Anne, although they were aware that she was his mother and that she agreed to the plan. They knew that she had visited Jerry when he was hospitalized. Staff members did discuss the plan with Jerry and Teddy. Defendant acknowledges that it would have been "better" to have talked with Anne personally, and that the VA guidelines suggest that individuals in Anne's role be evaluated and instructed. Defendant's personnel admit they were relying on Teddy and Jerry to advise Anne and to do what they could to see that the plan worked. Jerry was discharged on the 12th of November with an outpatient appointment with Dr. Esther Gwinnell scheduled for the 16th.

There was considerable discussion at trial regarding Jerry's out-patient appointment. The only reference to this appointment in Dr. Gwinnell's book was the notation "*intake." Dr. Gwinnell testified that she always sets aside a period of time on certain days for appointments with patients that have been recently discharged from the hospital. She indicated that sometimes she writes the patient's name in her book and sometimes she does not. Dr. Gwinnell also testified that in 1982 these "intake" appointments were generally arranged by Mary Farrell, a liaison person between the out-patient clinic and Ward 5A. Ms. McLeod, Jerry's case manager, testified that she had set the appointment up with Ms. Farrell. Ms. Farrell did not testify at trial, and thus it is unclear whether the out-patient clinic was specifically informed that the intake appointment for Tuesday, November 16, 1982 was for Jerry Gowan. As indicated earlier, he attempted his suicide on the 17th, five days post discharge.

On the day of discharge, Jerry was anxious and concerned about the discharge and his future. His basic concerns about his marriage and employment status continued. On the night before discharge he had trouble sleeping and demonstrated anxiety and concern about departure. On the morning of discharge he remained concerned and did not leave the facility immediately. His pickup truck was parked outside and he had loaded it with the possessions he was to take to Chehalis. He was ambivalent about whether or not he should leave or remain at the hospital.

The chart reflects that, at one point, Dr. Rosen inquired as to whether he planned to "stay forever" in the Portland facility. Other team members also talked with him that morning. Finally, after remaining for lunch, he left. Team members testified that by the time he left he was reasonably cheerful and optimistic. They describe this as a "bright affect."

Plaintiff's experts opined that Dr. Rosen was specifically negligent to make the comment about "staying forever." One or more testified they assume the comment was made cruelly or sarcastically. Dr. Rosen and others refute this. Plaintiff's experts contend that Dr. Rosen had effectively "locked Jerry out" of the ward by that comment. Defendant refutes this. Dr. Rosen specifically denies his comment was made either cruelly or sarcastically. He states that he did so inquire, and that an

inquiry of that nature was appropriate. He said the remark was made in a kindly fashion and was designed to point out to Jerry what options existed. It was understood that the VA facility in Portland was short term, and that it was important not to contemplate staying any great length of time. Dr. Rosen insists that Jerry understood his comment and reacted appropriately.

Defendant testifies that Dr. Rosen, Dr. Reaves, Ms. McLeod and Ms. Stein (another team member) talked to Jerry at length that morning, separately and together. They stated that they encouraged him and discussed the discharge plan with him. They also state that they discussed other options, including "the Roseburg option." This option would mean admission to a long term mental health care facility maintained by the Veterans Administration in Roseburg, Oregon. Jerry was not eager for that alternative and the staff felt that it would be damaging to him and would end any hope for a return to productivity.

Defendant's witnesses testified that although Jerry was reluctant to leave and did express anxiety and concern, the discharge was proper on that day. All witnesses agreed that it is common for a patient to become dependent on such a facility and the care afforded there. This leads to anxiety upon discharge and also means that the staff must be aware of the possibility of a patient becoming overly dependent. Witnesses agreed that the staff should encourage discharge. It was also agreed that few, if any, patients with Jerry's condition are discharged "cured" or "well."

The staff evaluated Jerry's condition on the morning of November 12th. Two of them specifically discussed suicide with him. Jerry told Dr. Reaves that he was not considering suicide and would never do so because he had "too much to live for" and that he would not do so because of his son. The staff admits that Jerry was a suicide risk, but specifically found that he was not imminently suicidal at discharge.

Admission to the ward, to Roseburg or to a group care home is voluntary. Jerry could not have been kept on the ward involuntarily without a court order, nor could he have been sent to a group home without his consent. His consent was also necessary for admission to the facility in Roseburg. Defendant's agents testified that they would have obtained a court order had they determined Jerry was imminently suicidal, yet insistent upon leaving.

Jerry did act reluctant to leave on November 12th although he had expressed eagerness to leave on earlier occasions throughout his third hospitalization. I believe that if the staff had urged him to remain a few more days, or if they had strongly urged the Roseburg option, he would have complied. Hindsight tells us that that would have been a better course of action. Defendant's key personnel admit, in retrospect, that a course of action other than discharge would have been better. I find that it was not malpractice to discharge Jerry on November 12, 1982 any more than it had been to do so earlier.

Jerry had been discharged on two earlier occasions and had twice voluntarily returned when he felt he needed help. On one of the readmissions he specifically expressed concern about suicidal thoughts, and gave that as his reason for readmission. VA personnel were, therefore, aware that Jerry was concerned about his own future and was capable of assisting in his own rehabilitation. The better course of action is to urge patients such as Jerry back into the community. The alternative to community living (and available out-patient care) is warehousing in long term care facilities.

As earlier observed, defendant's witnesses agree that it would have been better to have evaluated and instructed Anne in some detail. As it turned out, Anne would have been evaluated very highly.[2] She was

2. Dr. Reaves testified that oftentimes the patients are discharged to single occupancy hotels in the Burnside area. These patients have no money, no family, no friends and virtually no emotional support.

able to and did provide loving care and attention for the five days Jerry remained with her. A thornier question arises about whether the failure to instruct or warn Anne was a substantial contributing factor in the tragedy of November 17th.

When Jerry left the hospital on November 12, he drove to the home he had, until recently, shared with Teddy. Teddy stated that he appeared despondent upon his arrival. She told him he could not stay and that he would have to go to his mother's home in Chehalis according to the discharge plan. Teddy went to phone the VA for advice, and Jerry wandered about the house. At this time Teddy had taken in a boarder, Mary Anne Kappes, to help with expenses.

Ms. Kappes stated that while Teddy was occupied on the telephone Jerry picked up a pen knife and began making jabbing gestures towards his body. This disturbed Ms. Kappes and she repaired to her room. After speaking with the VA, Teddy convinced Jerry that he should go to Chehalis and offered to drive him there. It wasn't until they were outside that Teddy noticed the knife. She testified that he continued the jabbing gestures while she was driving. Fearing that he would actually stab himself, Teddy pulled off the road and told Jerry he would have to drive the rest of the way himself. She remained behind and Jerry drove on to Chehalis alone.

The testimony is clear that the defendant's agents did not tell Anne that her son had suicidal ideations. They did not ascertain whether medical or mental health care was easily available—it was not. They did not tell her that the appointment on the 16th was important and that she should call them if and when she realized Jerry was not planning to keep his appointment. She had no phone number for the VA. It was known, however, that she was and would be in daily contact with Teddy. Anne had both Teddy's home and work phone numbers. Jerry, Teddy and Anne talked by phone every day during his stay in Chehalis.

Anne is not clear as to whether or not she had heard about suicidal ideations prior to Jerry's arrival on the 12th. Whether or not someone had advised her of the risk, she obviously was aware of it. She testified that she watched him carefully, stayed with him constantly and monitored his medications so that he would not "harm himself." Because of her concern she insisted on accompanying him to Portland on the 16th. She testified that she knew he had some sort of appointment in Portland on the 16th, but was uncertain as to whether it was with a doctor or was for a job. She was afraid to allow him to go alone for fear he would deliberately injure himself by driving off the road. He decided not to go to Portland if Anne insisted on going with him.

Anne testified that she invited other family members from Chehalis to visit, but that Jerry was not enthused about those visits. On one occasion he asked her to have one of the relatives bring his rifle with him when he came. Anne testified that he said he wanted the rifle "for hunting" but that because she was concerned she ignored the request. Anne and Jerry discussed a visit to other relatives in Alaska, but he was unenthusiastic about it. Anne did not think it was appropriate to discuss suicide with him, although some witnesses say it might have been helpful. She testified that she did not feel free to discuss her concerns with Teddy in detail, because Jerry was generally in the room when she talked to Teddy. He conversed with Teddy, as well, on those daily phone calls.

Anne testified that if she had been instructed to call the VA if she became concerned, she would have done so. She also testified that she would have been insistent that he keep the appointment with the outpatient clinic on the 16th, or at least to call them. In short, she would have followed any instructions given, but none were.

■ This is the plaintiff's strongest theory but plaintiff has again failed to sustain the burden of proof. I find that I must speculate in answering the "what would have happened if" questions. These are

some of the reasons I would be forced to speculate:

It is not known when Jerry decided to attempt to hang himself. Experts have testified that he could have made a conscious decision before he left the hospital. However, it is equally as likely that he made the decision on the 17th. If the decision were made several days in advance, who can say whether he would have changed his mind because of a telephone call or visit with a qualified team member? If it were a "last minute" decision, would not the earlier concern have been misplaced and would a visit to the out-patient clinic on the 16th have been helpful? It is as easy to speculate that an attempt at suicide would have simply been postponed, rather than abandoned.[3]

Plaintiff theorizes that discharge to a group care home would have been superior and should have been the course of action followed. It is speculation to conclude that Jerry was less likely to commit suicide in the group care home had he been discharged to such. Testimony at trial revealed that some patients actually commit suicide while hospitalized.

It is also impossible to know whether Anne could have done more if she had the total information available and, if she had done more, whether that would have made any difference. The fact of the matter is that Anne could hardly have increased her vigilance. As it was, Jerry went into the garage while Anne went to check the mail, and after ten or fifteen minutes she went looking for him. She found him hanging by the neck and was able to cut him down and call for help. As one of defendant's witnesses admitted, she saved his life because of her vigilance. Had Jerry been discharged to Teddy's custody he would have been in the family home alone during the day. He would not have had such concerned scrutiny in a group care home. If he had decided to commit suicide, he could have done so while a patient at a VA facility, at home or in a group care home.

It should be noted that the defendant's agents had the right to and did rely upon the assistance of others. In this case, they relied upon the help and support of Anne and Teddy, and also relied upon Jerry himself. It was known that Teddy had encouraged his admission to hospitals earlier and that on one occasion, Jerry had readmitted himself when staying alone because he had begun to think about suicide.[4] The defendant, under these circumstances, can never be totally and solely responsible for the well being of the patient.

Hindsight is not the test of due care, and none of these parties had the requisite crystal ball. To arrive at a verdict for the plaintiff, I would be required to speculate on the crucial issue of causation, and this I cannot do.

Defendant prevails, a judgment shall enter accordingly.

---

**3.** Dr. Colbach, one of defendant's experts, testified that on one occasion he had spoken with a patient just five minutes before he committed suicide. Dr. Colbach stated that the patient had a "bright affect" when he spoke with him and denied any suicidal ideations. Nevertheless, the patient committed suicide almost immediately after Dr. Colbach counseled him. Dr. Colbach also noted that it is not uncommon for a patient to commit suicide shortly after speaking with a mental health care professional.

**4.** In the latter part of September 1982, Teddy went to Hawaii for a business convention. She took Jeff with her, which left Jerry alone in the family home. Karen, who was preparing to move to San Francisco, came and stayed with her father during Teddy and Jeff's absence.